# United States Court of Appeals
## For the First Circuit

———————

     00-1457
     00-1534
     00-1560
     00-1561
     00-1628
     01-1150
     01-1873
     01-2248


UNITED STATES,
Appellee,

v.

MILTON A. NELSON-RODRIGUEZ; LUIS A. ROMERO-LÓPEZ;
MIGUEL A. RODRIGUEZ-RIVERA; EDUARDO ARROYO-MALDONADO;
CARLOS BONET-GONZALEZ; ANGEL CHEVERE-GONZALEZ;
LUIS CARIBE-GARCIA; RAÚL RIVERA-PÉREZ; VICTOR M. VALLE-LASALLE,

Defendants, Appellants.

———————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

———————

Before

Boudin, Chief Judge,
Lynch, Circuit Judge,
and Shadur,* Senior District Judge.

———————

———————

* Of the Northern District of Illinois, sitting by designation.

Marlene Aponte Cabrera for appellant Nelson-Rodriguez.

Rafael F. Castro Lang for appellant Romero-López.

Jose A. Suarez-Santa for appellant Rodriguez-Rivera.

Raymond L. Sanchez Maceira for appellant Arroyo-Maldonado.

Mauricio Hernandez Arroyo for appellant Bonet-Gonzalez.

Raymond Rivera Esteves for appellant Chevere-Gonzalez.

Marlene Gerdts for appellant Caribe-Garcia.

Linda George for appellant Rivera-Pérez.

Luz M. Rios Rosario for appellant Valle-Lasalle.

William C. Brown, Attorney, U.S. Department of Justice, with whom H.S. Garcia, United States Attorney, was on brief for appellee.

February 7, 2003

**LYNCH**, **Circuit Judge**.  Thirteen individuals were indicted on February 5, 1998 for participating in a conspiracy to possess with intent to distribute 1,000 kilograms of cocaine, five kilograms of heroin, and 5,000 pounds of marijuana, in violation of 21 U.S.C. § 846 (2000).  This case involves the appeals of nine of those defendants: Milton Nelson-Rodriguez ("Nelson"), Luis Romero-López ("Romero"), Miguel Rodriguez-Rivera ("Rodriguez"), Eduardo Arroyo-Maldonado ("Arroyo"), Carlos Bonet-Gonzalez ("Bonet"), Angel Chevere-Gonzalez ("Chevere"), Luis Caribe-Garcia ("Caribe"), Raúl Rivera-Pérez ("Rivera"), and Victor Valle-Lasalle ("Valle").  Six of the defendants -- Nelson, Rodriguez, Arroyo, Bonet, Chevere and Caribe -- were convicted at a trial in September 1999.[1]  Rivera and Valle were convicted at a second trial in September 2000.  Romero pled guilty before trial.

This case raises a large number of issues; the more important ones include:

(1)  whether the authorization for a wiretap was invalid when the government withheld certain information going to the trustworthiness of a relied-upon confidential informant in the affidavit used to apply for a wiretap order;

---

[1]  There were also two other defendants at the September 1999 trial who are not parties to this appeal, Julio Ortiz Guevara ("Ortiz") and Luis Diaz (whom we will refer to as "Luis Diaz" to distinguish him from a confidential informant named Jose Diaz). The jury was unable to reach a verdict with respect to Ortiz; he subsequently entered a guilty plea and has not appealed.  Luis Diaz was found guilty and has not appealed his conviction.

(2) whether a jury determination as to drug quantity and type for the entire underlying conspiracy is adequate for Apprendi purposes, and when an Apprendi claim must be raised to be preserved;

(3) the meaning of "special skill" in U.S.S.G. § 3B1.3, which authorizes a two-level increase in sentence if the defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense";

(4) a claim that the government failed to move for a substantial assistance reduction of sentence under U.S.S.G. § 5K1.1 as retaliation against a cooperating defendant for telling the truth;

(5) the existence of constraints, if any, on the ability of a district judge to impose a term of supervised release in cases under §§ 841 and 846 that is in excess of the term contemplated by U.S.S.G. § 5D1.2;

(6) a claim of deprivation of a right to speedy trial arising out of a 14-month period between conviction and sentencing;

(7) a claim of improper ex parte contact between a probation officer and the prosecution after the initial presentence report but before the filing of an amended report which supported a new sentence enhancement;

(8) on the review of a denial for a motion for new trial, a claim that defense counsel had a potential conflict of interest because he simultaneously represented another conspirator, who was

previously acquitted but then had pled guilty, in sentencing issues resulting from a plea agreement.

Save for one aspect of a claim by Rodriguez concerning his term of supervised release, we reject all of the claims raised by defendants. The length of the opinion is mandated by the fact that it is the equivalent of nine opinions as to the nine defendants.

I.

With challenges to the sufficiency of the evidence, we recite the facts in the light most favorable to the jury's guilty verdicts. See United States v. Bayes, 210 F.3d 64, 65-66 (1st Cir. 2000). As to other issues, we objectively view the evidence of record. See United States v. Piper, 298 F.3d 47, 50 (1st Cir. 2002).

A. The Investigation

An FBI investigation of the conspiracy, led by FBI Special Agent Michael Plichta, began when Jorge Hernandez-Miller ("Hernandez") agreed to infiltrate a drug trafficking organization run by Rivera and serve as a confidential informant ("CI"). Hernandez had been convicted in a 1993 drug importation case known as the "Al Capone" case and served 36 months in jail, a reduced sentence because he had cooperated with the government in that case as well. In 1997, two years after Hernandez was released from prison, he told the FBI that he wanted to help apprehend

individuals from the Al Capone case who were still at large. Hernandez said he wanted to cooperate with the government because he feared for the safety of himself and his family; some of the Al Capone individuals still at large, he claimed, broke into his house while he was in prison. Under his agreement with the FBI, Hernandez was to receive twenty-five percent of the forfeitures made as a result of his cooperation. By September 7, 1999, he had received $21,000.

In the course of their interactions, Hernandez heard Rivera mention names of coconspirators, including Caribe and Bonet, who knew that Hernandez had cooperated with the government in the Al Capone case. Hernandez, fearing that these conspirators could have exposed him as an informant, introduced another CI, Jose Diaz, as his employee. He hoped to have Diaz attend any meetings where the people in attendance might recognize Hernandez from his time as a drug trafficker.

Hernandez and Diaz were the government's main witnesses at both of the trials. A third principal government witness, Luis Torres Orosco ("Torres"), was a charged defendant who pled guilty and testified about his involvement in the conspiracy. The government also played numerous audiotapes of conversations in which the defendants discussed their drug trafficking activity. The FBI investigators had obtained tapes both from consensual

recordings made by the CIS and from a wiretap on a cellular phone that Hernandez sold to Rivera.

B.  The Conspirators

The defendants were part of a drug operation led by Rivera that imported drugs from Colombia to sell in Puerto Rico and New York.  According to the indictment, the conspiracy began "no later than in or about April 1997" and continued until November 1997, when arrests in the case began.  The evidence at the two trials showed, inter alia, four planned importations of cocaine from Colombia (only one of which was successful), one planned importation of heroin from St. Maarten, and one planned importation of more than 4,000 pounds of marijuana.

Each defendant had a different role in the conspiracy. Rivera was the leader and Arroyo was his lieutenant.  They arranged for the boat, navigational charts, and radios necessary to import the drugs.  When Arroyo became too greedy, Rivera replaced him with Valle.

Bonet was to captain Rivera's receiving boat, which would take the drugs to Puerto Rico in at least one of the early shipments.  On the fourth planned importation, Ortiz was to serve in this role.  Torres was the coordinator of certain drug shipments.  Caribe oversaw security at the drop-off point on shore and, through his brother-in-law, Mark Figueroa-Jarvis ("Figueroa"), helped arrange for the distribution of the drugs in New York.

Nelson was involved in distribution of the imported drugs, and was also captured on audiotape discussing with Rivera plans to import between 6,000 and 10,000 pounds of marijuana. Rodriguez took the cocaine from Puerto Rico to New York, where he sold it to Figueroa.

CI Hernandez, meanwhile, worked with the Colombians to get the drugs to Puerto Rico, and also traveled to St. Maarten on Rivera's behalf to negotiate the heroin importation. CI Diaz participated in various activities of the conspiracy, including trips to Colombia and St. Maarten. Hernandez also introduced an undercover agent of the U.S. Customs Service, Agent Victor Rosa, as the captain of a boat that was to bring cocaine from Colombia to a rendezvous with Rivera's boat.

C. The Drug Importation Plans

1. Planned Importation of 1,100 Kilograms of Cocaine

CI Hernandez testified about a planned importation of 1,100 kilograms of cocaine in early 1997. Hernandez had connections in Colombia through Humberto Arduandua, a Colombian drug trafficker with whom Hernandez had been imprisoned. Arduandua put Hernandez in contact with Rivera in the spring of 1997; he told Rivera that Hernandez could be an intermediary between the Colombian drug suppliers and Rivera's drug distribution organization to facilitate cocaine importation. As an intermediary, Hernandez was responsible for examining the boats and

equipment used to transport the drugs from Colombia and the delivery site for the drugs in Puerto Rico.

Hernandez called Rivera on April 25, 1997, and the two set up a meeting later that night. This call, like many between the CIS and members of Rivera's organization, was recorded by the FBI. Hernandez met Rivera and Arroyo, whom Rivera introduced as one of his employees, at the Condado Hotel, and they began negotiating a contract to import 1,100 kilograms of cocaine from Colombia. Hernandez and Rivera agreed to the basic details of the transaction: Hernandez would arrange for the drugs to be transported from Colombia to a location approximately 35 miles off the northern coast of Puerto Rico, where Rivera's organization would pick up the drugs in their own boat and bring the drugs into Puerto Rico. Rivera told Hernandez that he wanted 25 percent of the load from the Colombians as payment and that half of the remaining load would be sold in Puerto Rico while the other half would be shipped to New York.

Two days later, Hernandez met Rivera and Arroyo to inspect the shore area where the load would be delivered. They showed him the elevated area from which Rivera's employees would watch the delivery. Rivera also told Hernandez that Arroyo had a friend who owned a car rental business where the drugs would be stored.

-9-

At their next meeting, on May 3, 1997, Hernandez met Rivera and Arroyo at a Travelodge hotel and introduced them to Rosa, the undercover agent posing as one of Hernandez's employees. The FBI videotaped this meeting with a hidden camera. Hernandez told Rivera that Rosa would captain the boat that would bring the cocaine load from Colombia to Rivera's boat off the coast of Puerto Rico. Arroyo brought navigational charts to the meeting, which the conspirators used to pinpoint the location where Rivera's boat would pick up the drugs from Rosa. A few days later, Rivera provided Hernandez with a two meter radio, which would be used during the operation.

In the summer of 1997, Hernandez and his putative employee, CI Diaz, traveled to Venezuela and Colombia to finalize the division of the drugs between the Rivera/Hernandez organization and the Colombians. Hernandez later spoke to Rivera about how they should split their share of the cocaine load, and Rivera suggested that he and Hernandez become partners.

When Hernandez and Diaz returned from their trip, Hernandez learned that Arroyo had been replaced by Valle, another of Rivera's employees, because Arroyo had asked for one million dollars as payment for his role in the shipment. Rivera told Hernandez that they would use different equipment and a different shore area as a result of the replacement and asked Hernandez to look at both on his next trip to the island. Hernandez later met

with Rivera and Valle to inspect the new boat and shore area. He also saw the house where Rivera's team would temporarily store the drugs. At this meeting, Valle showed Hernandez a police scanner and told him that they would have "no trouble" because one of his relatives worked with the local police. The planned shipment was never made because several problems arose, including the arrest of one of the cocaine suppliers in Venezuela.

2. Successful Importation of 250 Kilograms of Cocaine

Torres, the cooperating defendant, testified about a successful shipment of 250 kilograms of cocaine that occurred on July 16, 1997. Torres was the coordinator for this shipment, and oversaw security and the distribution of the cocaine. Chevere was responsible for security when the cocaine load was delivered: he had weapons at the delivery site and made sure that the people delivering the drugs would not attempt to take the drugs back after they received payment. After the shipment was delivered, Torres and Rivera went to a nearby repair shop and divided the cocaine between them. Rivera received approximately 50 kilograms, for which he promised to pay Torres a discounted price amounting to over $600,000; Torres kept the remaining 200 kilograms. Rivera arranged for most of his cocaine to be sent to Figueroa, Caribe's brother-in-law in New York, because the price of cocaine was higher in New York. Figueroa sold the cocaine and sent some of the

proceeds back to Rivera. Chevere, Caribe, and Nelson each had a role in distributing Rivera's share.

### 3. Attempted Importation of 36 Kilograms of Cocaine

In the summer of 1997, Torres also became involved in the conspiracy's planned importation of 36 kilograms of cocaine. Torres testified that Rivera introduced him to Nelson. Rivera and Nelson had arranged for a 36 kilogram load of cocaine to be sent from Venezuela to Puerto Rico on a boat. Nelson's nephew, Luis Diaz, tied the load to the bottom of a boat that was going to Puerto Rico. While the boat was en route, the load was lost. The Colombians who had supplied the cocaine kidnapped Luis Diaz and threatened to kill him unless they were paid for the shipment. Torres, Rivera, and Nelson discussed ways to gain his release, but he eventually escaped on his own.

### 4. Planned Importation of Eight Kilograms of Heroin

On October 12, 1997, Caribe sent the CIS, Hernandez and Diaz, to St. Maarten to arrange for a shipment of eight kilograms of heroin into Puerto Rico. Hernandez and Diaz were responsible for transporting the heroin to Puerto Rico. They met with a man named Francisco and agreed that Rivera's organization would keep three kilograms of heroin, while the remaining five kilograms would either be sold or distributed by Rivera with the proceeds going back to Francisco's organization.

        5.  <u>Planned Importation of 700 Kilograms of Cocaine</u>

In July 1997, CI Diaz went to Colombia to arrange for the importation of more cocaine into Puerto Rico.  Diaz testified that the Colombians agreed that Hernandez and Diaz's organization could import 700 kilograms of cocaine into Puerto Rico and, if that shipment went well, they would be able to import larger shipments in the future.  On August 16, 1997, Diaz met with Rivera and Caribe to discuss importing the 700 kilograms.  During this meeting, Rivera and Caribe promised to show Diaz that they had the equipment, security, and other prerequisites to handle the importation of large quantities of cocaine.  Rivera also gave Diaz a gun to give to Hernandez; Rivera said the gun was "clean" and could be used.

On October 29, 1997, Diaz met with Rivera and Bonet. They looked at the nautical charts showing where the drugs would be brought into Puerto Rico, and Bonet showed Diaz the radio that would be used during the operation.  The next day, October 30, Diaz, Rivera, Caribe, Figueroa, and Bonet met again.  Bonet and Caribe conducted a test of a radio that would be used in the shipment.  The FBI was able to record Bonet's voice during this test.

Diaz testified that he and Bonet conversed during their car trips to and from these meetings.  Bonet assured Diaz that his team "had been in drug trafficking for many years" and "had the

necessary equipment, including the boats, communication, security at the beach and the captains."  Bonet also said that he had been sought by the FBI in the Al Capone case, but the FBI was unable to identify him because it did not know his full name.  He said that someone named Frank Jones had become a "snitch" and that "they were going to kill him."  "Frank Jones" was Hernandez's previous alias from his time as a drug trafficker.

On November 1, 1997, Diaz, Rivera, and Bonet met a third time.  Caribe introduced Diaz to Ortiz, the boat captain for the shipment.  Caribe told Ortiz that he would make sure that Ortiz had a working motor for his boat by the shipment date.  The group made plans to meet at a future date to view the site selected for delivery of the load.  There is no evidence that this meeting or the shipment ever took place, possibly because several defendants were arrested during early November.

D. Convictions and Sentences

Romero pled guilty and was sentenced to 135 months of imprisonment and 5 years of supervised release.  Juries found the other eight defendants guilty as charged.  They received varying sentences, as follows:

Rivera: Life imprisonment and 5 years supervised release;

Chevere: 540 months imprisonment and 10 years supervised release;

Caribe: 420 months imprisonment and 8 years supervised release;

Valle: 360 months imprisonment and 10 years supervised release;

Bonet: 360 months imprisonment and 20 years supervised release;

Arroyo: 324 months imprisonment and 20 years supervised release;

Nelson: 293 months imprisonment and 10 years supervised release;

Rodriguez: 151 months imprisonment and 15 years supervised release.

## II.

On appeal, not all defendants raise every claim. The defendants who make each claim are identified in the section heading.

## A. Sufficiency of the Evidence (Caribe, Rodriguez, Arroyo)

Caribe, Rodriguez and Arroyo argue that the evidence was insufficient to establish a conspiracy, or to link each of them to it individually. The guilty verdicts stand unless, viewing the evidence in the light most favorable to the prosecution, no reasonable jury could have rendered them. See United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995). That burden is not met here.

There are three basic components to a drug conspiracy: "[T]he existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." United States v. Gomez-Pabon, 911 F.2d 847, 852 (1st Cir. 1990). "Mere association" with the conspirators or "mere presence" during activities of the conspiracy will not, standing alone, be sufficient for conviction. Id. at 853. The statute under which these defendants were convicted, 21 U.S.C. § 846, requires no overt act in furtherance of the conspiracy. United States v. Shabani, 513 U.S. 10, 15 (1994). A conspiratorial agreement may be inferred from circumstantial evidence. See United States v. Aponte-Suarez, 905 F.2d 483, 490 (1st Cir. 1990).

Caribe and Arroyo both argue that the existence of a conspiracy was not proven, because many of the drug importation plans never came to fruition. A conspiracy need not succeed for a conspiracy conviction to stand. Indeed, the underlying act need not even be attempted. See United States v. Martin, 228 F.3d 1, 11 (1st Cir. 2000). "The gist of a conspiracy is an agreement to disobey or to disregard the law." United States v. Palmer, 203 F.3d 55, 63 (1st Cir. 2000). They also argue that various negotiations failed to produce a complete "meeting of the minds" on issues such as the exact location for the handover of the drugs at sea or the division of the proceeds. But there was a vast amount of evidence presented, including testimony from informants and

-16-

numerous audiotapes, from which a reasonable jury could easily determine that an agreement existed among Rivera and his associates to work together to buy and sell illegal narcotics.

Each of the three defendants also argues that even if there were a conspiracy, the evidence was insufficient that he knew of it and participated in it voluntarily. A reasonable jury most certainly could disagree.

There was evidence of Caribe's knowing involvement in the conspiracy's plans to import illegal drugs. For example, CI Diaz testified that he met with Caribe and Rivera on August 16, 1997 to make specific plans in connection with the importation of between 700 and 1,000 kilograms of cocaine. Diaz also testified about attending a meeting at Caribe's house on October 29, 1997. Caribe and others discussed drug smuggling plans, tested radios, and reviewed nautical charts. CI Hernandez testified that he had participated in a test of radio equipment with Caribe (as well as Rivera and Bonet) and that Rivera had told him that Caribe would supervise security at the dropoff point on the shore for a planned importation.

The evidence as to Rodriguez was that he knowingly transported Rivera's cocaine from Puerto Rico to New York, where it was sold to Figueroa, Caribe's brother-in-law. Rodriguez emphasizes that none of the CIS ever met him directly. But several intercepted telephone conversations, including two July 21, 1997

-17-

calls made by Rivera, supported his guilt, directly and indirectly. In one, Rivera told Figueroa that Rodriguez would be meeting with him in New York to deliver "shirts" (code for cocaine, according to an FBI agent who testified). In another, Rivera called Rodriguez, then in New York, to coordinate Rodriguez's meeting with Figueroa and to discuss the price for the cocaine. A search of Rodriguez's apartment in Puerto Rico after his arrest found corroborating evidence such as airplane tickets to New York for the relevant time period and his cell phone bills.

Finally, Arroyo, who was replaced early in the conspiracy, argues that the government proved only mere presence or association. There is no further indication of his participation after his demand for one million dollars was rebuffed. Nonetheless, before that time, Arroyo's involvement in the conspiracy's plans was extensive. He joined Rivera at the initial April 25 meeting with Hernandez at the Condado Hotel. He also brought the nautical charts to the May 3 meeting, which the FBI videotaped; Arroyo looked over the charts with Agent Rosa, supposedly the captain of Hernandez's boats, to fix a location for their rendezvous.

Arroyo relies on Aponte-Suarez, 905 F.2d at 491, where this court vacated a drug conspiracy conviction for insufficient evidence. The defendant there demanded money from drug traffickers for the use of his land as an airstrip; when they refused, he

introduced them to a neighbor and had no further involvement with the conspiracy.  Id.  Arroyo, in contrast, was an active participant up until the time his financial demands were refused. For similar reasons, Arroyo's alternate argument that he withdrew from the conspiracy is a non-starter.  "[W]ithdrawal is not a defense to a conspiracy charge if the conspiracy violation has already occurred."  United States v. Rogers, 102 F.3d 641, 644 (1st Cir. 1996).

The evidence about the existence of a conspiracy, and the knowing and voluntary involvement of Caribe, Rodriguez, and Arroyo, was clearly sufficient for the jury to reach a guilty verdict.

B.  Pre-Trial Claims

1.  Prosecutorial Misconduct (Bonet)

Bonet argues that his conviction should be vacated because of prosecutorial misconduct before the grand jury.  Bonet asserts that Agent Plichta was the only witness who testified against him before the grand jury and that Plichta made two false statements.  Plichta stated that the search of Bonet's house revealed a 20/40 radio and an antenna set up on a tree outside the house.  At trial, Agent Juan Grajales, one of the agents who conducted the search, testified that the FBI in fact seized a CB radio and an antenna, which they found in the dining room.  Agent Plichta admitted at trial that he had been mistaken.  Bonet claims that no other evidence against him was presented to the grand jury

and that the prosecutor encouraged Plichta to testify falsely to bolster the case.

The Supreme Court in United States v. Mechanik, 475 U.S. 66 (1986), rejected the defendant's claim that his conviction should be vacated because the prosecutor allegedly violated Fed. R. Crim. P. 6(d) by permitting two law enforcement agents to be questioned together before the grand jury. The Court held that any error was harmless because the defendant was subsequently convicted. In such cases, "the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt." Id. at 70.

Two years later, in Bank of Nova Scotia v. United States, 487 U.S. 250 (1988), the Court carved out a narrow exception to the Mechanik rule. This exception applies only if "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." Id. at 256-57; see also United States v. De Jesus, 230 F.3d 1, 4 (1st Cir. 2000) ("Thus, dismissal after conviction is appropriate only in cases of serious and blatant prosecutorial misconduct -- misconduct so grave that it calls into doubt the fundamental fairness of the judicial process.") (internal quotations omitted). The Supreme Court noted that this exception was consistent with past cases in which the Court had dismissed

indictments after convictions because it found racial or gender discrimination in the selection of the grand jury. Bank of N.S., 487 U.S. at 256-57 (citing Vasquez v. Hillery, 474 U.S. 254 (1986), and Ballard v. United States, 329 U.S. 187 (1946)). However, we have cautioned that this exception should be "invoked infrequently, largely as a prophylactic tool to discourage further misconduct of a like nature." United States v. Giorgi, 840 F.2d 1022, 1030 (1st Cir. 1988).

Bonet faces an additional hurdle: he did not raise his claim before the district court, and so review is only for plain error. A party claiming plain error must demonstrate (1) that there was error, (2) that it was plain, (3) that it affected the defendant's substantial rights, usually by altering the outcome, and (4) that it was sufficiently fundamental to threaten the "fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 732-36 (1993).

The record does not establish prosecutorial misconduct, much less misconduct so egregious that it rendered the grand jury proceedings fundamentally unfair. At most there was an understandable mistake in testimony. The FBI agents involved in the case had been tracking the defendants for several months and had gathered innumerable facts about the organization. CI Diaz testified at trial that he was present when Bonet tested a 20/40 radio at his house that would be used in the planned importation of

-21-

700 kilograms of cocaine. Bonet also showed him the antenna that he had placed on a tree outside his house. The most likely explanation for Agent Plichta's misstatements is that he simply confused the radio and antenna seen by Diaz with those seized by the FBI. Given the corroborating evidence for the substance of Plichta's account, if not the exact details, his grand jury testimony did not affect the defendant's substantial rights or seriously impair the fairness, integrity, or public reputation of the judicial proceedings.

### 2. Bill of Particulars (Nelson)

Nelson argues that the district court abused its discretion by denying his motion for a bill of particulars. There was no abuse of discretion.

The indictment names Nelson twice. First, it charges Nelson with initial involvement in the planned importation of 10,000 pounds of marijuana. Second, it charges that Rivera instructed Luis Diaz, Nelson's nephew, to go to Colombia to arrange for the importation of cocaine into Puerto Rico, and that Rivera and Nelson made efforts to obtain Luis Diaz's release after he was kidnapped by Colombian drug suppliers.

Nelson argues that he was not put on notice of the government's evidence at trial concerning his involvement in the attempted importation of 36 kilograms of cocaine that was lost at sea. The Colombians kidnapped Luis Diaz to ensure that Nelson

would pay them for this lost cocaine.  Nelson argues that the indictment does not refer to cocaine in this context and states only that he tried to gain his nephew's release, which is not a criminal act.

The indictment stated that the conspiracy involved attempts "[t]o import large amounts of controlled substances into the District of Puerto Rico," and detailed the dates of the conspiracy and the names of the coconspirators.  The indictment specifically charged the defendants with conspiracy with intent to distribute over 1,000 kilograms of cocaine.  Additionally, Nelson had access during discovery to recordings of conversations between him and other conspirators discussing the importation of cocaine. Nelson did not lack a fair opportunity to prepare a defense absent a bill of particulars.  See United States v. Sepulveda, 15 F.3d 1161, 1192-93 (1st Cir. 1993).  United States v. Paiva, 892 F.2d 148 (1st Cir. 1989), held that the district court did not abuse its discretion in denying the motion for a bill of particulars even though the indictment did not inform the defendant of a number of transactions he allegedly aided.  Id. at 154.  The court there held that the indictment referred to "quantities of cocaine" and thus informed the defendant that the charge involved more than one transaction.  See id. at 155.

Nelson does not explain how the indictment's lack of specificity prejudiced him at trial.  A defendant must show "actual

prejudice" and point to "specific evidence or witnesses that the lack of particularization prevented him from obtaining." United States v. Arboleda, 929 F.2d 858, 869 (1st Cir. 1991); see also Sepulveda, 15 F.3d at 1193 ("Neither appellant convincingly relates a concrete instance of inability to prepare, untenable surprise, or other cognizable prejudice stemming from the trial court's refusal to mandate further particulars."). Nelson does not argue that he was unable to prepare a defense to the allegations, nor does he point to any evidence that he would have presented. We reject the claim.

### 3. Duplicitous Indictment (Nelson, Chevere)

Nelson and Chevere argue that the indictment was duplicitous because it charged the defendants with possessing several drugs (cocaine, heroin, and marijuana) with intent to distribute. Neither defendant raised this claim prior to trial; the review is for plain error. There was no error, much less plain error, on this point. It has been clear since the Supreme Court's decision in Braverman v. United States, 317 U.S. 49 (1942), that "[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime, and that is one, however diverse its objects." Id. at 54. The conspiracy charged here included the planned importations of cocaine, heroin, and marijuana. Each of these acts was part of a

single conspiracy, and the jury instructions made clear that the jury must find as much.

Nelson also argues that the indictment was duplicitous because it charged two crimes, possession of drugs with intent to distribute and conspiracy to possess drugs with intent to distribute, in a single count of the indictment. This claim is rebutted by the plain language of the indictment, which states only that the defendants conspired to possess controlled substances with intent to distribute. The indictment does not charge the defendants with possession with intent to distribute, and the jury did not consider any such charge.

## C. Wiretap Evidence (Nelson, Rodriquez, Bonet, Chevere, Caribe, Rivera, and Valle)

Defendants argue that evidence obtained from wiretaps should have been suppressed.[2] They also argue that the district court erred in refusing to hold a hearing in accordance with Franks v. Delaware, 438 U.S. 154 (1978), before it denied the motion to suppress the wiretap evidence. Although in other circumstances the failure of the government's affidavit supporting its warrant application to disclose information about the background of a CI

---

[2] This issue was the focus of Nelson's original motion for a new trial, timely filed on November 1, 1999. Because the question is thus properly before us and we answer it fully, we need not consider whether some of the other defendants may have waived the issue.

could well lead to suppression, we ultimately find neither argument by defendants in this case to be meritorious.

### 1. Suppression

Congress has placed statutory requirements on warrants authorizing wiretaps, extending beyond the constitutional minimum mandated for other search warrants. See Omnibus Crime Control and Safe Streets Act of 1968, Title III, 18 U.S.C. §§ 2510-2522 (2000). See generally United States v. Lopez, 300 F.3d 46, 51-52 (1st Cir. 2002) (providing overview of Title III's provisions). Law enforcement authorities seeking a wiretap warrant must submit a sworn affidavit which includes "a full and complete statement of the facts and circumstances" that demonstrate probable cause and a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1). A judge considers this affidavit under the standards of Title III before issuing an order authorizing the wiretap. These restrictions are intended to ensure that authorities "make a reasonable, good faith effort to run the gamut of normal investigative procedure before resorting to means so intrusive as electronic interception of telephone calls" and that wiretapping as a law enforcement technique remains "distinctly the exception -- not the rule." United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987).

The issuing judge's initial decision to grant a wiretap order is subject to review in at least two different contexts. First, the trial judge may consider a motion to suppress the evidence gathered by the wiretap that the issuing judge authorized; later, an appellate court may review the trial judge's suppression ruling. See United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989). Both of these later reviewing courts use the same metric to evaluate the action of the issuing judge, which is to examine the face of the affidavit and "decide if the facts set forth in the application were minimally adequate to support the determination that was made." Id. (quoting United States v. Scibelli, 549 F.2d 222, 226 (1st Cir. 1977)).

Agent Plichta submitted an affidavit in support of the application on June 24, 1997. The government sought permission to tap a cellular telephone which CI Hernandez had sold to Rivera (on the pretense that it was a cloned phone that allowed unlimited calling). After discussing Plichta's experience and training, the affidavit chronicled in detail the investigation up to that point, beginning with the first contact between Hernandez and Rivera on April 25, 1997. The affidavit revealed information obtained from Hernandez's audio recordings of his conversations with defendants in both telephone calls and face-to-face meetings; the May 3 meeting that was attended by Rosa, the undercover agent, and was secretly videotaped; visual surveillance; court-authorized pen

registers; and searches of toll records of several telephone numbers used by Rivera.

While the incriminating information gathered by these methods and reported in the affidavit was substantial, the affidavit stated that these methods were unlikely to uncover the full scope of the conspiracy, even if augmented by other possible techniques such as executing search warrants or issuing grand jury subpoenas. Each technique displayed just a small piece of the puzzle. Meanwhile, the conspirators made careful efforts to evade detection, such as switching telephones and vehicles and using counter-surveillance. Finally, searches or grand jury subpoenas would alert the conspirators that they were under investigation.

The defendants mainly argue that the affidavit downplayed both (a) the availability and promise of alternate investigative techniques and (b) the potential unreliability of Hernandez as a source. We consider these claims in turn.

a. Necessity of Wiretap

Defendants argue that progress made in the investigation using other methods meant that wiretapping was unnecessary. Title III requires that the affidavit show why wiretapping is necessary in place of less intrusive investigative techniques. 18 U.S.C. § 2518(1)(c). But it does not impose an exhaustion requirement. Lopez, 300 F.3d at 52. "Accordingly, the government is not required to show that other methods have been wholly unsuccessful."

-28-

_Ashley_, 876 F.2d at 1072. Rather, "Title III demands a practical, commonsense approach to exploration of investigatory avenues and relative intrusiveness." United States v. Uribe, 890 F.2d 554, 556 (1st Cir. 1989).

An eight-page section of the affidavit explained quite specifically why the investigative techniques then in use, alone or combined with others that had not been employed, would likely fail to uncover the full extent of the conspiracy. The affidavit's discussion of alternate methods does not fall below the standard of minimal adequacy. See United States v. Rivera-Rosario, 300 F.3d 1, 19 (1st Cir. 2002); Uribe, 890 F.2d at 556-57; Ashley, 876 F.2d at 1074-75.

Nelson also argues that the number of person-hours dedicated to the investigation at the time of the warrant -- he estimates forty-one hours -- was per se too short to demonstrate the necessity of a wiretap. There is no rule on the amount of time investigators must try and fail, using other methods, before turning to a wiretap application. See United States v. David, 940 F.2d 722, 729 (1st Cir. 1991). The issuing judge here had the relevant information and was able to weigh the amount of prior investigation among other relevant factors in reaching a decision on the necessity of the wiretap.

b.  Omission of Information About Hernandez's Background

The defendants also argue that the affidavit relied on information from CI Hernandez, but failed to disclose his prior drug trafficking conviction, his past involvement with some defendants, and other indicia of his possible unreliability.  The affidavit was, to put it mildly, economical on this point, stating only that there was no indication that Hernandez "has been less than truthful at any time with regard to this investigation."  This statement was crafted carefully to avoid mention of facts that would call Hernandez's trustworthiness into serious question.  We are concerned that such significant omissions could thwart the intent of Title III and mislead an issuing judge, who relies on the government to present the full case for its belief in probable cause, including any contraindications.[3]

The troubling omissions here have less significance because the affidavit also included large quantities of evidence from sources other than Hernandez.  Reliance on Hernandez's credibility was therefore unlikely to have been important to the issuing judge's decision.  We use the technique described in United States v. Young, 877 F.2d 1099 (1st Cir. 1989) (Breyer, J.), and reach the same result as in that case.  "That is to say, if we

---

[3]  At oral argument it was suggested that the government may have provided further information about Hernandez to the issuing judge orally.  Even were this so, our review is limited to the four corners of the affidavit.  See Ashley, 876 F.2d at 1074.

-30-

excise (or otherwise appropriately adjust) all misleading statements from the affidavit, there is still a more than adequate showing of 'probable cause.' Thus any misstatements are immaterial." Id. at 1102 (citations omitted). Even without reliance on Hernandez, the affidavit provided the issuing judge substantial basis for probable cause. There were over a dozen recorded conversations, the interactions with undercover agent Rosa, and the videotape of the May 3 meeting. On these facts, the omission of information about Hernandez's background was not a basis for suppression.

Other objections to scattered statements in the affidavit, even if they had any merit in isolation, would similarly fail because of the large quantity of evidence on which the issuing judge could rely.

### 2. Franks Evidentiary Hearing

Some defendants also argue that the case should at least be remanded for an evidentiary hearing about the alleged flaws in the affidavit. A defendant seeking such a hearing must make a "substantial preliminary showing" that the affidavit included a false statement which was made either knowingly and intentionally or with reckless disregard for the truth, and that this misstatement was necessary to the finding of probable cause. Franks, 438 U.S. at 155-56, 171-72; see United States v. Adams, 305 F.3d 30, 36 n.1 (1st Cir. 2002) (preliminary showing for Franks

hearing requires <u>both</u> of these elements).  A material omission in the affidavit may also qualify for a <u>Franks</u> hearing in place of a false direct statement, provided the same requisite showing is made.  <u>United States</u> v. <u>Scalia</u>, 993 F.2d 984, 987 (1st Cir. 1993).  We review the district court's denial of a <u>Franks</u> hearing for "clear error."  <u>United States</u> v. <u>Ranney</u>, 298 F.3d 74, 77 (1st Cir. 2002).  The ruling above disposes of this argument because the defendants fail to make the second required showing -- Hernandez's necessity to a finding of probable cause.

D.  <u>Other Evidentiary Rulings</u>

1.  <u>Exclusion of Impeachment Evidence Against Hernandez Caribe and Rivera)</u>

Caribe and Rivera argue that the court erroneously excluded evidence that CI Hernandez had a role in the October 30, 1992 killings of five alleged drug traffickers known as the "Mickey Motors murders."  Three people were convicted for these murders.  Hernandez, who acknowledged to the government that he was present during the killings, was not prosecuted.  The judge excluded the evidence as collateral under Fed. R. Evid. 403.

Where, as here, the objection was not properly preserved, we review a district court's decision to admit or exclude evidence for plain error.  <u>United States</u> v. <u>Scott</u>, 270 F.3d 30, 46 (1st Cir. 2001).  The term "collateral," for Rule 403 purposes, refers to evidence that is likely to confuse the issues, mislead the jury, or waste time.  <u>See</u> 1 C.B. Mueller & L.C. Kirkpatrick, <u>Federal</u>

Evidence § 95, at 512 (2d ed. 1994). The trial court has wide discretion in determining admissibility under Rule 403, United States v. Abel, 469 U.S. 45, 54-55 (1984), since the trial judge "is more directly familiar than a court of appeals with the need for the evidence and its likely effect." United States v. Lau, 828 F.2d 871, 874 (1st Cir. 1987); see also United States v. Cintolo, 818 F.2d 980, 998 (1st Cir. 1987) (trial judge "has a front row seat which gives him a unique vantage point").

The district judge did not abuse his discretion by excluding the impeachment testimony, which would have had little probative value. The murders, which occurred in 1992, were unrelated to the drug conspiracy here, which covered events in 1997. The government was prepared to offer testimony from multiple witnesses that Hernandez was not the killer. Further, the jury already knew that Hernandez had a history of serious criminal behavior; indeed, Hernandez himself admitted that he had been a drug dealer. Moreover, testimony by several witnesses about Hernandez's role in the murders might have confused the jury as to the issue before it.

Caribe raises two related issues. First, he argues that the trial judge violated the Confrontation Clause by denying him the right to cross-examine Hernandez with respect to his criminal past. Second, he argues that the government failed to produce and concealed reports of debriefings from prior investigations which

contained allegations that Hernandez was involved in drug dealing and the Mickey Motors murders.[4] According to Caribe, this failure to produce violated Brady v. Maryland, 373 U.S. 83 (1963), Roviero v. United States, 353 U.S. 53 (1957), Giglio v. United States, 405 U.S. 150 (1972), and the Jencks Act, 18 U.S.C. § 3500. None of these separate doctrines provides grounds for relief unless the exclusion or failure to produce prejudiced Caribe's defense. See United States v. Noone, 913 F.2d 20, 32 (1st Cir. 1990) (alleged Confrontation Clause violation); Brady, 373 U.S. at 87 (suppressed evidence must be material); United States v. Bagley, 473 U.S. 667, 682 (1985) (evidence is material for Brady purposes if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); Giglio, 405 U.S. at 154 (requiring the same finding of materiality of the evidence as Brady); Roviero, 353 U.S. at 64-65; United States v. Rosario-Peralta, 175 F.3d 48, 53 (1st Cir. 1999) (Jencks Act). Since Hernandez's alleged role in the Mickey Motors murders was a collateral matter, and the defense showed at trial that Hernandez had an extensive criminal past, Caribe has failed to show any form of prejudice, and that disposes of his claims.

---

[4] Caribe also argues that the reports contained relevant information on Caribe's "drug quantity [and] role in the offense." We deal separately with these other issues.

2.  Exclusion of Alibi Evidence (Bonet)

Bonet argues that the district judge erred in excluding his alibi evidence for October 29, 1997 and October 30, 1997.  The district court found Bonet provided the requisite notice of alibi too late in the trial process.  Bonet adequately preserved his objection.

Defense counsel was obliged by Fed. R. Crim. P. 12.1(a) to give the government notice of an intent to offer an alibi defense within ten days of the government's written demand for such notice.  There is a continuing duty to disclose if defense counsel learns of additional alibi witnesses prior to or during the trial.  Id. at 12.1(c).  If a party does not comply, then the testimony of its alibi (or rebuttal) witnesses may be excluded.  Id. at 12.1(e).  In its discretion, the court may grant an exception for good cause to any of the above requirements.  Id. at 12.1(d).[5]

Taylor v. Illinois, 484 U.S. 400 (1988), guides this court's application of Rule 12.1(d).  See United States v. Portella, 167 F.3d 687, 705 (1st Cir. 1999) (holding that Taylor standard is used to review preclusion of an alibi defense).  Taylor requires the court to balance the defendant's right under the Sixth

_____

[5]  A new version of Rule 12.1 took effect on December 1, 2002. This new version changes the organization of the rule's different provisions, but does not change the analysis here.  We cite to the new version.

Amendment to offer the testimony of witnesses in his favor against "countervailing public interests":

> The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process . . . .

484 U.S. at 414-15. "The judge should also factor into the mix the nature of the explanation given for the party's failure reasonably to abide by the discovery request, the willfulness vel non of the violation, the relative simplicity of compliance, and whether or not some unfair tactical advantage has been sought." Chappee v. Vose, 843 F.2d 25, 29 (1st Cir. 1988). We review application of the Taylor factors de novo. United States v. Levy-Cordero, 67 F.3d 1002, 1013 (1st Cir. 1995).

Bonet concedes that the government filed a request for alibi notice and served it on Bonet's counsel in February 1998. Bonet waited approximately one-and-a-half years before filing his alibi notice, near the end of the first trial, on September 22, 1999. Applying Taylor, the court denied Bonet's request as untimely.

Bonet argues that he was unaware he might need an alibi for October 29 and October 30, 1997 until CI Diaz testified for the prosecution that he met with Bonet on these dates; the defense contends that before Diaz took the stand on September 14, 1999, "the government never mentioned these two dates."

The government's request for alibi notice referred to the times the alleged offenses were committed as stated in the grand jury indictment, which alleged that Bonet (and coconspirators) committed two overt acts in furtherance of the conspiracy "[o]n or about October 30, 1997." The "on or about" language provides adequate notice for both October 29 and October 30. See United States v. Leibowitz, 857 F.2d 373, 379 (7th Cir. 1988) (where the indictment alleged that an offense took place "on or about" a certain date, the defendant is deemed to be on notice, for purpose of alibi defense, that the charge is not limited to a specific date).

Moreover, it is far from clear that there was any prejudice. Even if the indictment had provided adequate notice only for October 30, an alibi witness for October 29 alone would have been of little help to Bonet and might well have hurt his cause. The meetings on October 29 and October 30 covered the same ground: the participants reviewed how they would import 700 kilograms of cocaine into Puerto Rico. On October 30, the FBI recorded Bonet's voice as he tested the audio equipment. On the tape, Bonet brags about his drug-dealing exploits.

Bonet resorts to the good cause prong of the rule, arguing his delay in filing the alibi notice was not motivated by a desire to gain a tactical advantage. He also complains the district judge's terse statement of his decision was more akin to

a finding of fact than the requisite finding of law.  See Levy-Cordero, 67 F.3d at 1013 (whether to exclude alibi evidence is a question of law).  Since our review is de novo, the last complaint is irrelevant.  This court has never restricted the application of the sanction of exclusion to discovery violations that are willful or intended to gain a tactical advantage.  Portella, 167 F.3d at 705 n.16; Chappee, 843 F.2d at 29.  The exclusion of the evidence was not in error.

### 3.  Admission of Hearsay Statements by Arduandua (Rivera)

Rivera argues error in the admission of CI Hernandez's hearsay testimony that Arduandua, the Colombian who had been incarcerated with Hernandez, said that Rivera was involved in the drug trade.[6]  There was no objection.  Review is for plain error, and there was none.  The admitted statement is reasonably understood as being offered, not to prove the truth of the matter asserted, but to explain why Hernandez contacted Rivera at the beginning of the investigation.

### 4.  Admission of Evidence About Cruz Murder (Rivera)

Rivera argues error under Rule 403 in the admission of CI Hernandez's testimony about Rivera's role in the killing of

---

[6]  Rivera's brief also contends that the court erred by admitting Hernandez's testimony that a person loosely associated with Rivera was responsible for a break-in at Hernandez's house.  As the government correctly observes in its brief, Rivera's objection that Hernandez lacked personal knowledge of that person's involvement was sustained, and that portion of Hernandez's testimony was excluded.

Roberto Cruz, a murder alleged to have been committed in furtherance of the conspiracy.[7]

The district court did not abuse its discretion in finding that the testimony was probative. It confirmed Rivera's role in the conspiracy and tended to show that the 250-kilogram shipment had in fact been delivered. Rivera allegedly committed the murder in concert with a coconspirator and in furtherance of the conspiracy. Hernandez testified that Rivera and a subordinate killed Cruz "because of the kilos . . . [;] [Rivera] had not allowed [Cruz] to participate and [Cruz] had been stalking him." Cf. United States v. David, 940 F.2d 722, 731-33, 737 (1st Cir. 1991) (no abuse of discretion in admitting evidence against alleged ringleader of conspiracy concerning beating of drug courier suspected of stealing shipment).

Rivera also argues that the government violated discovery rules by disclosing an FBI Form 302 Report of Hernandez's debriefing "only days before the testimony was to be introduced." At trial, defense counsel objected to the admission of testimony by Hernandez covering topics addressed in the 302 report, including Rivera's claim of responsibility for the Cruz murder, on the

---

[7] Rivera's complaint about the reliability of the evidence is belied by the facts of record. Rivera stated in taped conversations that he had killed the person in the photograph on page three of the August 11, 1997 edition of El Vocero, a newspaper in Puerto Rico. That page does indeed contain a photograph of a corpse later identified as Cruz.

grounds that the government's failure to disclose this document at an earlier date violated the Jencks Act, 18 U.S.C. § 3500. This argument fails. The Jencks Act provides that the government does not need to disclose the statement or report of a government witness "until said witness has testified on direct examination in the trial of the case." Id. § 3500(a).

E. Closing Argument and Jury Instructions

    1. Objection to Prosecutor's Closing Argument (Nelson)

Nelson argued both at his trial and to us that a statement made by the prosecutor in closing argument, described below, was improper and prejudicial.

We review de novo whether the challenged statement was improper, and for abuse of discretion whether the misconduct, if any, warrants a new trial. United States v. Hernandez, 218 F.3d 58, 68 (1st Cir. 2000). The standard for determining whether a new trial is warranted is:

> An improper argument to the jury that does not implicate a defendant's constitutional rights . . . constitutes reversible error only where the prosecutor's remarks were both inappropriate and harmful. Improper statements during closing argument are considered harmful if, given the totality of the circumstances, they are likely to have affected the trial's outcome. In making that determination, we focus on (1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendants.

United States v. Wihbey, 75 F.3d 761, 771-72 (1st Cir. 1996) (footnote and citations omitted). A prosecutor's comments do not rise to the level of a constitutional violation unless they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)); see 5 W.R. LaFave et al., Criminal Procedure § 24.7(h), at 562 (2d ed. 1984). The challenged statement does not implicate constitutional rights.

At the first trial, where Nelson was convicted, the prosecutor concluded a summary of the evidence against Caribe by remarking of him and two of the other defendants, "Caribe, Bonet and [Ortiz] got away, they got away from us . . . [b]ack in 1993." She next recalled Bonet's statement to Rivera and CI Diaz while they were on the way to an October 30, 1997 meeting in Bonet's home; Bonet said that the FBI was "a bunch of suckers" who had failed to arrest him for his role in the earlier Al Capone drug trafficking case. The prosecutor then said:

> I request very respectfully from you that they [sic] do not let them and the other defendants in this case get away with it again. Let us make sure that not one, not one kilogram of cocaine more is imported into Puerto Rico by these seven defendants. Let us make sure of that.

Nelson challenges the "let them and the other defendants in this case get away with it again." He argues there was no evidence of prior crimes on his part and that it was improper to

raise the specter that he was doing it _again_.  That is not so clear.  There was evidence that Nelson had a role in the botched importation of the 36 kilograms of cocaine that were lost by his nephew, Luis Diaz.

The government argues that the trial court overruled the objection on the basis that the jury would, in context, have understood the remark to actually refer only to Caribe, Bonet, and Ortiz, and especially to Bonet's boasting of prior crimes.  The use of "again" could be understood, of course, to refer to hypothetical past crimes of the other defendants and not be restricted to those defendants the prosecutor had just named.  But, in context, the stray "again," if the jury thought about it at all, would most likely link back to those particular defendants.  Even if "again" were understood to refer to all the defendants, we think there was no harm done and certainly do not think the wayward "again" would affect the outcome of the trial.  See _Wihbey_, 75 F.3d at 771-72.

As to Nelson's mere generalized argument that the prosecutor made an emotional appeal to anti-drug dealing sentiment in Puerto Rico, it too fails.  "Closing arguments traditionally have included appeals to emotion. . . .  The outer limit on emotional appeals is generally stated as a prohibition against 'arguments calculated to inflame the passions or prejudices of the jury.'"  5 LaFave et al., _supra_, § 24.7(e), at 558.

2.  <u>Requested Jury Instructions (Arroyo, Nelson)</u>

Arroyo appeals the district court's refusal of his requested jury instruction that a conspiracy conviction is not possible if the defendant conspired only with government agents or informants.  This legal point, while true, is inapplicable to the case against Arroyo.  When there are at least two "true" conspirators, the involvement of a government agent or informant does not defeat the true conspirators' culpability.  <u>See</u> <u>United States</u> v. <u>Giry</u>, 818 F.2d 120, 126 (1st Cir. 1987).  The evidence at trial showed that Arroyo joined in meetings with not only CI Hernandez and Agent Rosa, but also Rivera.  His unsupported suggestion that he and Rivera should be counted as each independently conspiring with the CIS and the undercover agent is unavailing.

Nelson appeals the district court's refusal to deliver requested jury instructions concerning proof of the identity of the defendant as the person who committed the crimes, mere presence, and his defense theories of necessity and good faith.  He properly preserved these requests for appeal.  There was no error.

Nelson requested a separate instruction concerning the factors to consider when evaluating the identification of a defendant by a witness.  The government incorrectly contends that potential misidentification was not relevant to Nelson's defense.  To the contrary, his "two Nelsons" theory of mistaken identity

hinged on it. The proof of Nelson's guilt was at least partly dependent on Hernandez's connection of Nelson to the voice of the person with whom he spoke on the telephone and to the person about whom Rivera and other coconspirators spoke. Defendant Nelson says he is not the Nelson in those phone calls.[8]

A district court's refusal to give a requested instruction is erroneous only if the instruction "was not substantially covered in the charge actually delivered to the jury." United States v. Gibson, 726 F.2d 869, 874 (1st Cir. 1984) (quotation omitted). Here, it was. The district court delivered a broader charge concerning the credibility of witnesses in general and the jury's responsibility to consider possible limitations on the ability of a witness to observe the facts about which he testified.

Nelson also requested an instruction that "mere presence" was insufficient for conviction. Similarly, the court explicitly instructed the jury that mere presence was not sufficient to prove a conspiracy charge, so Nelson's claim has no merit.

---

[8] Nelson argues that there were "two Nelsons," the defendant and a Colombian supplier also known as Nelson. He points to a reference in the FBI affidavit seeking a wiretap warrant, in which CI Hernandez reported that he had witnessed a telephone call between Rivera and "Nelson LNU [Last Name Unknown]." "Nelson" is this defendant's last name, not his first name. In the affidavit, Rivera and Nelson are said to have discussed Rivera paying Nelson for the 36 kilograms of cocaine that were lost in transport, as well as arrangements for a future shipment.

Nelson's asserted necessity defense[9] turns on the kidnapping of his nephew by the Colombians. Nelson sought assistance from Rivera and CI Hernandez, hoping they would intervene with the kidnappers, and Hernandez testified that he tried to do so. Rivera recommended that Nelson offer to pay the Colombians back with work on future shipments. In the end, Nelson's nephew escaped from his kidnappers unharmed. Nelson argues that his fear for his nephew's safety compelled him to do the things for which he was convicted.

A defendant must make a showing of a factual predicate for a necessity defense that is sufficient to raise a question for the jury. See United States v. Arthurs, 73 F.3d 444, 448 (1st Cir. 1996); United States v. Amparo, 961 F.2d 288, 291 (1st Cir. 1992). That predicate is demanding:

> To successfully assert the necessity defense, a defendant must show that he (1) was faced with a choice of evils and chose the lesser evil, (2) acted to prevent imminent harm, (3) reasonably anticipated a direct causal relationship between his acts and the harm to be averted, and (4) had no legal alternative.

United States v. Sued-Jimenez, 275 F.3d 1, 6 (1st Cir. 2001).

Here, Nelson did not proffer any evidence that he was forced to join the other defendants' conspiracy because of fear for

---

[9] The traditionally separate defenses of necessity and duress have become increasingly blurred in modern decisions, to the point of merger. See United States v. Bailey, 444 U.S. 394, 410 (1980). We will follow the parties' lead and refer to the defense offered here as "necessity."

his nephew's safety. There was no evidence that the kidnappers demanded he do so; they simply wanted their money back. It was never demonstrated that harm to his nephew was imminent, or that Nelson had no legal alternatives. Finally, there was evidence that Nelson's criminal activity continued after his nephew had escaped. In short, the evidence did not adequately support any of the required elements for a necessity defense.[10]

Nelson's separate request for a "good faith" jury instruction is misplaced, as there is no good faith defense for participating in a narcotics conspiracy. If the argument was meant to address the intent required for a conspiracy conviction, the district court instructed on that point, stating that the government must prove that a defendant "knew the unlawful purpose of the agreement and joined in it willfully; that is, with the intent to further the unlawful purpose." See New Eng. Enters., Inc. v. United States, 400 F.2d 58, 71 (1st Cir. 1968) (holding that a forthright instruction on specific intent is ordinarily a sufficient response to a defendant's request for a good faith instruction).

---

[10] We also reject Nelson's argument, advanced pro se, that the reference to his nephew's kidnapping in the indictment transformed the necessity defense into an integral part of his charge.

F.  "Supplemental" Motion for a New Trial (Nelson)

Nelson filed a timely motion for a new trial on November 1, 1999.  It dealt entirely with objections to alleged flaws in the wiretap affidavit; these arguments were analyzed earlier in this opinion.  On March 9, 2000, Nelson filed a "supplement" to this motion for a new trial, which raised a different set of substantive issues concerning Nelson's theory of mistaken identity.  The court denied Nelson's motions for a new trial on December 15, 2000.

Nelson knew the basis for his "two Nelsons" theory of mistaken identity before and during trial, and referred to it in a motion for mistrial during the government's case in chief.  The supplement does not claim to rely on any newly-discovered information available only after trial.  As such, it is time-barred.  See Fed. R. Crim. P. 33(b)(2) (allowing seven days after verdict for filing motions for new trial based on grounds other than newly-discovered evidence).  Fed. R. Crim. P. 45(b) explicitly constrains the district court from extending the time period set out in Rule 33.  See United States v. Holt, 170 F.3d 698, 702-03 (7th Cir. 1999); United States v. Hall, 854 F.2d 1269, 1271-72 (11th Cir. 1988).  Construing this very late filing (on an entirely separate issue) as an amendment would violate both the letter and the spirit of both rules, and create a "back door" for untimely challenges to verdicts.  Holt, 170 F.3d at 703.  We refuse to do so.

-47-

G.  Ineffective Assistance of Counsel (Rivera, Caribe and Nelson)

Rivera, Caribe, and Nelson raise issues concerning alleged conflicts of interest on the part of the attorneys who represented them at trial.  Caribe also makes another claim of ineffectiveness of counsel unrelated to the alleged conflicts.

Rivera first raised his claim before the district court in a post-verdict motion for a new trial and made factual assertions in support of the motion.  While Rivera points to a potential conflict of interest, he failed to carry his burden to show any actual negative impact on his representation, and the denial of his motion for new trial was not error.

Unlike Rivera, Caribe and Nelson did not raise their ineffective assistance arguments in front of the district court at all, and we will not entertain their fact-dependent but thinly-supported claims for the first time on direct appeal.

1.  Rivera

Rivera, who was convicted at the second trial, says he became dissatisfied with his appointed counsel and hired Edgar Vega-Pabon ("Vega") as his attorney a few weeks before his trial began.  Vega also represented Ortiz, who was indicted as a member of Rivera's conspiracy.  Unlike Rivera, Ortiz was tried in the first trial.  The jury there hung as to Ortiz, but the government pursued a retrial and Vega then negotiated a plea agreement for

Ortiz.  This agreement was completed before Rivera's trial began, although Ortiz was not sentenced until after Rivera's conviction.

The district court in the second trial never inquired into the potential conflict of interest raised by Vega's representation of both Rivera and Ortiz, although the same judge presided over both proceedings and apparently was aware of Vega's role in the first trial.  In its ruling denying Rivera's motion for a new trial, the district court relied on the Advisory Committee Notes to Fed. R. Crim. P. 44(c) and concluded that Vega had engaged in joint representation by working, at least for a period of time, both for Rivera on his trial and for Ortiz in preparation for his sentencing.  The government does not challenge this determination of joint representation and we will assume it to be correct for purposes of this case.

Rivera's initial brief, citing United States v. Foster, 469 F.2d 1 (1st Cir. 1972), rests on the assertion that the district court's failure to conduct a hearing into the possible conflict requires a new trial.  This analysis misreads Foster, which indicated at most that, when the district court does not inquire into a conflict, then on direct appeal the burden of persuasion shifts to the government to demonstrate that a negative effect from the conflict was "improbable."  Id. at 5.  We long ago cautioned against granting an undeserved "windfall" to defendants by vacating convictions on the basis of Foster violations "where it

is more likely than not that conflicting interests did not hamper counsel's pursuit of a potentially effective defense." United States v. Martorano, 620 F.2d 912, 916 (1st Cir. 1980); see also Brien v. United States, 695 F.2d 10, 15 (1st Cir. 1982) ("[T]he conflict must be real, not some attenuated hypothesis having little consequence to the adequacy of representation.").

Moreover, the continued vitality of the Foster burden-shifting framework is called into question by the Supreme Court's recent decision in Mickens v. Taylor, 122 S. Ct. 1237 (2002). That case involved a situation where the trial judge had "fail[ed] to inquire into a potential conflict of interest about which it knew or reasonably should have known." Id. at 1239. The Supreme Court concluded that such a failure on the trial judge's part "does not reduce the petitioner's burden of proof" to demonstrate that the potential conflict he alleges actually affected the representation he received in order to show a constitutional violation. Id. at 1244. The Mickens requirement that the defendant show the alleged conflict actually affected the representation received is not precisely the same as demonstrating prejudice. Id. at 1244 (standard "requires proof of effect upon representation but (once such effect is shown) presumes prejudice"). But Mickens does require more than the showing Rivera offered in his opening brief,

filed before <u>Mickens</u>, by simply pointing to the absence of a <u>Foster</u> hearing.[11]

In this case, because the likelihood of the joint representation having an effect on Rivera's defense is so minimal, it does not matter who had the burden. The district court determined, and we agree, that the government had amply shown that Rivera's defense did not suffer from any conflict. Thus, we need not, and do not, decide the burden-shifting question here.

The standard for an effect is that the defendant "might plausibly have pursued an alternative defense strategy, and that the alternative strategy was in conflict with, or may not have been pursued because of, [the attorney's] other loyalties or interests." <u>United States</u> v. <u>Ramirez-Benitez</u>, 292 F.3d 22, 30 (1st Cir. 2002); <u>see also</u> <u>Reyes-Vejerano</u> v. <u>United States</u>, 276 F.3d 94, 97 (1st Cir. 2002) (applying same test); <u>Brien</u>, 695 F.2d at 15 (adopting same test).

---

[11]   In his reply brief, filed after <u>Mickens</u>, Rivera attempts to demonstrate the effect on his representation as follows:
> Strategies concerning the development of Rivera's perceived role in the organization as compared with that of Ortiz, arguments related to separate conspiracies, temporal limitations regarding the scope of independent conspiracies, proofs concerning drug quantities at Rivera's trial which differed from those in the plea entered into by Ortiz and for which Ortiz had yet to be sentenced, considerations involved in calling Ortiz as a witness, as well as plea and/or cooperation agreement overtures, for which Rivera was in competition with Ortiz, were, necessarily, influenced.

The existence of an alternative strategy is most implausible here. Ortiz, the other defendant represented by Vega, was a minor figure in the conspiracy. Rivera, however, was the leader, and he eventually received a life sentence, the stiffest of any defendant. The suggestion that the government would have accepted a plea from Rivera in preference to one from Ortiz is untenable, even more so since Ortiz had already entered his plea before Rivera's trial began. Nor do we find any significant evidence that might have been helpful to Ortiz's sentencing but harmful to Rivera's trial, or vice versa. There is no indication that Rivera would have any good reason to call Ortiz as a witness. Finally, the potential impact of any conflict was further reduced because Rivera's previous appointed attorney remained in the case as co-counsel with Vega. In fact, it is reasonable to think that Rivera hired Vega precisely because he managed to get a hung jury for Ortiz, knowing the lawyer would complete his post-plea representation of Ortiz through sentencing. Rivera, it seems, wanted to have his cake and eat it too.

On different facts, we might conclude that an underlying multiple representation presents a serious question of conflict. In Rivera's case, however, there is nothing more than speculation of possible conflict, which would not pass muster after Mickens or before it. See United States v. Burgos-Chaparro, 309 F.3d 50, 52-53 (1st Cir. 2002) (finding "speculation" an inadequate threshold

showing by defendant claiming conflicts after <u>Mickens</u>); <u>United States</u> v. <u>Michaud</u>, 925 F.2d 37, 41 (1st Cir. 1991) (rejecting, in pre-<u>Mickens</u> case, conflict of interest claim that was "insufficiently specific" in describing nature of conflict). In order to find an effect from an alleged attorney conflict, "some adverse action or inaction is required that can be traced to the conflict in loyalty. Merely to speculate that the divided loyalty could have caused such a step is not enough." <u>Burgos-Chaparro</u>, 309 F.3d at 53.

### 2. <u>Caribe and Nelson</u>

As to Caribe and Nelson, who did not present their claims to the district court, it is the settled policy of this court not to entertain fact-specific ineffective assistance of counsel claims on direct appeal when they have not been raised previously. <u>See</u> <u>United States</u> v. <u>Campbell</u>, 268 F.3d 1, 7 (1st Cir. 2001). There is an exception to this rule "where the critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration of an ineffective assistance claim." <u>United States</u> v. <u>Netanel</u>, 938 F.2d 302, 309 (1st Cir. 1991). But the exception does not apply to any of the three claims that Caribe or Nelson advances.

Caribe's purported conflict of interest is that one of his attorneys, Jose Aguayo, represented CI Hernandez in a previous case. Caribe says that he was unaware of this previous

relationship until after his own trial and would not have accepted Aguayo as his lawyer if he had known.  But the factual presentation he makes is inadequate for us to judge the effect of any conflict. Caribe also makes a more common ineffectiveness claim alleging shortcomings in the performance of one of his other attorneys, but it too is very fact-specific and it is supported by no more than a list of complaints in Caribe's brief.  Finally, Nelson's claim, advanced pro se, is even more clearly ineligible for consideration under the <u>Netanel</u> exception.  He asserts a conflict of interest based on his lawyer's representation of David Ramos-Rivera, who was not indicted as a defendant in this conspiracy case; Nelson offers no explanation of the supposed conflict.  We will not entertain any of these three claims for the first time on the meager record the appellants present to us.[12]

---

[12]  For the same reason, we also reject Rivera's claim, raised cursorily in his appellate briefs and not raised in his motion for a new trial before the district court, that attorney Vega was further conflicted because of his past representation of Miguel Montanez (a/k/a "Mickey Motors").  Above, we uphold the district court's decision to exclude impeachment evidence from Rivera's trial concerning the alleged connection between CI Hernandez and the Mickey Motors murders.  Rivera makes no explanation of how Vega's past relationship with Montanez made any difference to the case, and seems merely to have tacked this claim onto his more sustained argument concerning joint representation with Ortiz.