UNITED STATES of America, Plaintiff(s)

v.

Johnny LAZU–RIVERA, et al., Defendant(s)

United States of America, Plaintiff(s)

v.

Felix Carlos Egipciaco Figueroa, et al., Defendant(s)

United States of America, Plaintiff(s)

v.

Felix Rafael Egipciaco Figueroa, et al., Defendant(s)

United States of America, Plaintiff(s)

v.

Anibal Fernandez–Tavarez, et al., Defendant(s).

Criminal Nos. 03–249(JAG), 03–250(PG), 03–251(HL), 03–252(DRD).

United States District Court, D. Puerto Rico.

March 23, 2005.

Lynn M. Doble–Salicrup, United States
Attorney'S Office, Pretrial Services, U.S.

Marshal, U.S. Probation, San Juan, PR, for Plaintiff.

Luis R. Rivera–Rodriguez Luis Rafael Rivera Law Office, Gabriel Hernandez–Rivera, Law Offices of Gabriel Hernandez Rivera, Francisco Acevedo–Padilla, Acevedo Law Office, Laura Maldonado–Rodriguez, Laura Maldonado Law Office, Julio Morales–Sanchez, Ramon Gonzalez–Santiago, Hernandez Sanchez Law Firm, Fernando J. Carlo–Gorbea, Fernando J. Carlo Law Office, Rafael Anglada–Lopez, Rafael Anglada Lopez Law Office, Rosa I. Bonini–Laracuente, Bonini Law Office, Peter John Porrata, Peter John Porrata Law Office, Ignacio Rivera–Cordero, Rivera, Barreto & Torres Manzano Law Office, Luis R. Rivera–Rodriguez, Luis Rafael Rivera Law Office Nicolas Nogueras–Cartagena, Nicolas Nogueras Law Offices, Teodoro Mendez–Lebron, Teodoro Mendez Lebron Law Office, Max Perez–Preston, Perez Preston Law Associates Lydia Lizarribar–Buxo, Lizarribar Masini Law Office, Gustavo A. Del–Toro–Bermudez, Carlos Noriega–Rodriguez, Carlos R. Noriega Rodriguez Banco Cooperativo, Esther Castro–Schmidt, Francisco Rebollo–Casalduc, Francisco Rebollo Casalduc Law Office, Bruce J. McGiverin, Maria H. Sandoval, Maria H. Sandoval Law Office, Fernando J. Carlo–Gorbea, Fernando J. Carlo Law Office, Lorenzo J. Palomares–Starbuck, Lorenzo Palomares PSC Attorneys, Joaquin Monserrate–Matienzo, Joaquin Monserrate Matienzo Law Office, Jose R. Aguayo, Jose R. Aguayo Law Office, Jose F. Quetglas, Quetglas Law Office, Frank D. Inserni–Milam, Frank D. Inserni Law Office, David Ramos–Pagan, Cardona, Ramos & Assoc., Esther Castro–Schmidt, Fernando J. Carlo–Gorbea, Fernando J. Carlo Law Office, Michael Raymond Hasse, Hasse & Associates, Alexander Zeno, Anita Hill–Adames, Anita Hill Law Office, Rafael Anglada–Lopez, Rafael Anglada Lopez Law Office, Hector A. Deliz, Deliz & Torres Gonzalez Law Office, San Juan, PR, Frederic Chardon–Dubos, Frederic Chardon Dubos Law Office, Moca, PR, Ramon Garcia–Garcia, Santurce, PR, Ernesto Reyes–Blassino, ERB Law Office, Carlos E. Beck, Carlos Beck Law Firm, Guaynabo, PR, Jorge Manuel Carmona–Rodriguez, Jorge Manuel Carmona Law Office, Mercedita, PR, Robert W. Odasz, Robert Odasz Law Office, Carolina, PR, Luis R. Lugo–Emanuelli, Lugo Emanuelli Law Office, Fajardo, PR, Francisco Valcarcel, Federal Public Defender's Office, Hato Rey, PR, Juan P. Rivera–Roman, Juan P. Rivera Roman Law Office, Ponce, PR, Luis A. Cintron–Lopez, Luis A. Cintron Lopez Law Office, Noel Aviles–Gonzalez, Aguadilla, PR, for Defendants.

Edwin Encarnacion–Colon, San Juan, PR, pro se.

William Rivera–Baez, San Juan, PR, pro se.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

On September 15, 2003, the Government filed four indictments charging numerous defendants with violations to 21 U.S.C. § 853 and 21 U.S.C. §§ 841, 843(b), and 846. Although there are four separate indictments, a single conspiracy is charged against all defendants. The four criminal cases were, however, consolidated for the sole purpose of entertaining and ruling on defendants' motions to suppress the Title III interceptions of two telephones. Of the thirty-six defendants charged in the indictments, twenty-four have moved for suppression. The motions were referred to Magistrate–Judge Aida Delgado for a Report and Recommendation. On December 29, 2004, the Magistrate–Judge recommended that the Court deny defendants' motions to suppress (Crim. No. 03–249 Docket No. 183; Crim. No. 03–250 Docket

No. 209; Crim. No. 03–251 Docket No. 314; Crim. No. 252 Docket No. 228). Seventeen of the defendants have either filed objections to the Report and Recommendation or joined in their co-defendants' objections (Crim. No. 03–249 Docket Nos. 191, 194, 195; Crim. No. 03–0250 Docket Nos. 229, 230; Crim. No. 03–251 Docket Nos. 332, 334, 335, 336, 339; Crim. No. 03–252 Docket Nos. 230, 231, 237, 238, 239, 240, 241). On February 24, 2005, the Government filed an omnibus response to defendants' objections (Crim. No. 03–249 Docket No. 208; Crim. No. 03–250 Docket No. 237; Crim. No. 03–251 Docket No. 352; Crim. No. 03–252 Docket No. 247). Upon review of the objections, the Court **ADOPTS** the Report and Recommendation in its entirety. Accordingly, the Court **DENIES** defendants' motions to suppress.

### FACTUAL BACKGROUND[1]

A. *Applications for Target Phone No. 1*

On March 4, 2003, the Government submitted an application for Title III interception of telephone 787–637–3419 ("Target No. 1"), which was granted by the District Court on that same date. The initial monitoring of outgoing and incoming calls from Target No. 1 was initiated on March 5, 2003, after the holding of a minimization conference. An extension of the time during which to conduct interceptions of Target No. 1 was authorized by the Court on April 10, 2003. The interception of Target No. 1, considering all extensions granted, concluded on May 9, 2003.[2]

The record reflects that the Government's affidavit in support of the Title III application specified that the interceptions were geared to unveil:

(i) the identities and roles of accomplices, suppliers, aiders and abettors, co-conspirators, and other participants ...; (ii) location and source of resources used to finance their illegal activities; (iii) the location of narcotic processing laboratories; (iv) information pertaining to the delivery of heroin shipment to Puerto Rico from Colombia and other countries; (v) subsequent delivery of processed heroin to local heroin dealers as well as dealers outside Puerto Rico; (vi) time and dates for recovery of drug sales proceeds; (vii) the identities and roles of individuals receiving and distributing heroin locally; (viii) the firearms' storage location(s); the suppliers and identity and role of individuals providing firearms to the drug trafficking organization and its members.

Since Target No. 1 had voice mail capabilities, authorization was also sought to

(a) monitor all messages recorded and/or retrieved;

(b) record background conversations intercepted in the vicinity;

(c) allow for the interception to "take place in any other jurisdiction within the United States" in the event of having Target No. 1 transferred outside the jurisdiction.

Within the affidavit it is indicated the investigation "is being conducted by the ... (DEA) Caribbean Field Division, H.I.D.T.A. San Juan Initiative which includes the Puerto Rico Police Department (PRPD), the Immigration and Naturaliza-

---

1. The relevant facts are taken from the Magistrate–Judge's Report and Recommendation.

2. The original interception of target No. 1 was authorized for the period of March 5, 2003, through April 3, 2003. The extension period began on April 9, 2003, and was to expire not later that May 9, 2003. Government progress reports also indicate that the interception was actually discontinued on May 8, 2003.

tion Service (INS) and the Bureau of Alcohol, Tobacco and Firearms." No civilian entities or individuals were identified as possible participants of the interception process, except for interpreters or "citizens fluent in Spanish, who will be under contract with the Government and who, at all times, will be under direction and supervision of a suitable trained and experienced DEA agent ... who are deputized as Special Federal Officers."

In regards to individuals suspected of criminal activity, the Government identified six (6) suspects, to wit: Félix Rafael Egipciaco–Figueroa; Félix Carlos Egipciaco–Figueroa; William Rivera–Baez aka "Chino," Waldemar Rivera–Centeno, Roberto Vázquez–Tardaguila; and Leslie Miranda–Cruz.

Throughout the year 2002 the Government successfully utilized two confidential sources. Confidential Source # 1 ("CS # 1") managed to keep the Government abreast of Félix Rafael Egipciaco–Figueroa's illegal activities, the telephone numbers he utilized, arranged for drug purchases that were consequently recorded on audio and videotape, and enabled surveillance and consensual recordings of conversations held with the main target. As of April 2002, CS # 1 had facilitated the participation in planned criminal activities of a DEA undercover agent. During these periods of time, several purchases of small quantities (1/8 kilogram) of heroin were conducted. Confidential Source # 2 ("CS # 2"), identified as an individual incarcerated on federal charges, though having provided historical information regarding

the drug organization, remained unable to provide information on recent on-going illegal activities carried out by the organization.

The Government in its affidavit further establishes that, although by May and June 2002 the sale of a pistol, a rifle and an AK–47 and some information was elicited regarding a recent importation of 14 kilos of cocaine, no specifics regarding its sources and their individual identification were elicited by CS # 1. The role of CS # 1 in the investigation is depicted as that of a "broker" and his last telephone conversation with Félix Rafael Egipciaco–Figueroa in Target No. 1 was on February 16, 2003.

Other investigation techniques utilized by the Government (aside from the use of confidential sources, an undercover agent, audio and video recordings, consensual recordings) included the analysis of toll records for Target Phone No. 1, pen register information,[3] use of track and trace devices[4] and the review of other police reports and arrest records.

The Government concedes that conventional investigative techniques, though partially successful, had resulted fruitless in unveiling the full organization's structure, its full range of activities, the identity of drugs and weapons sources out of Puerto Rico (United States mainland, Colombia), the identity and roles of other co-conspirators and location of stash houses or illegal proceeds.

In its attempt to satisfy statutory requirements, the Government provided

---

**3.** Pen register records reveal that Target No. 1 had made or received approximately 4,669 calls from November 26, 2002, through February 18, 2003. Progress reports filed by the Government reflect approximately 4,394 calls were intercepted.

**4.** At the same time in which the Title III application was submitted the pen register and track and trace device were still operating. As a result the names of Orlando Ortiz–Colon, Jose Valentin–Almodovar, William Rivera–Baez ("Chino"), Waldemar Rivera–Centeno, and Roberto Vazquez were identified as possible suspects.

within a 48–page affidavit in support of Title III application a detailed account of all conventional investigative techniques, whether utilized or not, and how and why the same had proven either successful or unsuccessful in identifying the full scope of the organization, the conspiracy or the co-conspirators.

### B. Extension/Continued Interception of Target Phone No.1

On April 10, 2003, the Government submitted yet a second affidavit in support of a request for a thirty (30) day continuation of the previously authorized interception of Target No. 1. The objectives of the continued interception remained the same previously outlined. The types of communications sought to be intercepted were similarly described, the law enforcement agents involved, the background information reliability and the possible use of conventional investigative techniques was similarly discussed and, in essence, continued to be the same.

Nonetheless, in this affidavit, among the individuals previously named as "target subjects," other individuals were, for the first time, identified as interceptees: Anibal Fernández–Tavárez, Wilfredo Zapata–Figueroa, Pedro Sotomayor–Trinidad and Carmelo Torres–Vargas.

At the time, investigation into the illegal activities of the Egipciaco–Figueroa organization was still on-going and being carried out by the use of confidential sources (CS #1 and CS #2), an undercover agent, physical and electronic surveillance, audio and video recordings, the use of pen registers and track and trace devices, consensual recordings and review of police reports and arrest records. Meanwhile, the use of search and arrest warrants, grand jury subpoenas, and trash searches had been discarded as mechanisms that would be too dangerous, of doubtful value or could jeopardize the investigation.

### C. Application for Target Phone No. 2

While interception of Target No. 1 was on-going, on April 2, 2003, the Government also sought the Court's authorization for intercepting a second telephone, 787–567–5131 ("Target No. 2"), which is described as a cellular telephone with international mobile equipment, assigned to Margarita Torres–Ortiz but being utilized by Félix Rafael Egipciaco–Figueroa. Since Target No. 2 had voice mail capabilities, the Government sought to intercept exactly the same type of communications as with Target Phone No. 1.

In its statement of probable cause, law enforcement agents do identify as new targets or interceptees: Wilfredo Figueroa–Zapata, Ramón Valdés–Díaz, Juan Enrique De Aza, Roberto Moctezuma–Rivera and "FNU LNU" aka "Macario." The objectives of and law enforcement agencies participating in the interception remain the same as for Target No. 1. In regards to the investigative methods utilized, the Government outlined, once again, the reliability and use of the informant(s), an undercover DEA agent, and the results of the pen register and track and trace devices as well as the use of those other investigative techniques which would not appear feasible.

## DISCUSSION

### A. Standard for Reviewing a Magistrate–Judge's Report and Recommendation

A District Court may, on its own motion, refer a pending motion to a U.S. Magistrate–Judge for a Report and Recommendation. See 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); Local Rule 72(a). Pursuant to Fed.R.Civ.P. 72(b) and Local

Rule 72(d), the adversely affected party may contest the Magistrate–Judge's Report and Recommendation by filing written objections "[w]ithin ten days of being served" with a copy of the order. *See* 28 U.S.C. § 636(b)(1). Since defendants have filed timely objections to the Magistrate–Judge's Report and Recommendation, the Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which specific objection is made. *See United States v. Raddatz,* 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Lopez v. Chater,* 8 F.Supp.2d 152, 154 (D.P.R.1998).

**B.** *Defendants' Objections to the Report and Recommendation*

Although defendants filed separate objections to the Report and Recommendation, their arguments can all be summarized under three main categories: (1) that the wiretap application was insufficient to comply with the necessity requirement; (2) that the interception of Target No. 2 exceeded the thirty-day statutory maximum; and (3) that an evidentiary hearing was warranted so defendants could confront the statements of two Government agents.[5] The Court will address each argument in turn.

**1.** *The Necessity Requirement*

■ Pursuant to 18 U.S.C. § 2518(1)(c), an

> application for an order authorizing or approving the interception of a wire, oral, or electronic communication ... shall include ...:

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

"The necessity requirement was 'designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *United States v. Rivera–Rosario,* 300 F.3d 1, 18 (1st Cir.2002)(*quoting United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974)). It does not, however, impose a duty upon the Government to exhaust all other available investigative techniques before resorting to a wiretap. *See Rivera–Rosario,* 300 F.3d at 19; *United States v. Lopez,* 300 F.3d 46, 52 (1st Cir.2002)("[T]he necessity requirement is not tantamount to an exhaustion requirement."); *United States v. Edwards,* 69 F.3d 419, 429 (10th Cir.1995) ("[L]aw enforcement officials are not required to exhaust all other conceivable investigative procedures before resorting to wiretapping.").

■ The Magistrate–Judge made an extensive analysis of all three wiretap applications and found that the attached affidavits easily complied with § 2518(1)(c)'s requirements and fully justified the need for the wiretap. The affidavits discussed at length the investigative techniques which had been and would continue to be employed by government agents, such as confidential sources, pen registers, and track and trace devices, video and consensual audio recordings. But although some success had been achieved through the use of those methods, they failed to dis-

---

**5.** Defendant Valdes–Diaz also raises an objection on the grounds that the Government failed to comply with the minimization requirement. The objection, however, merely consists of a general allegation without an attempt to tie it to the facts of this case. It is a "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990). The Court will, thus, not address the minimization issue.

close the full extent of the conspiracy, including the roles of some already-identified suspects, identities of narcotics suppliers, distributors, contacts outside Puerto Rico, stash houses, or the structure of the entire organization. The affidavits further disclosed methods which had proven unsuccessful or were not viable given the facts of the case. These include CS # 1's limited interaction with the suspects, CS # 2's imprisonment, and the failure of the undercover agent to infiltrate the higher levels of the organization. Other methods, such as search warrants, grand jury subpoenas, and interrogation of suspects were discarded as they could alert the conspirators and jeopardize the investigation.

Defendants object by arguing that the Government had achieved success through less-intrusive methods and with their continued use more information on the conspiracy could have been uncovered, even if the full extent of the conspiracy was never known. As they so artfully put it, "the United States can[not] pursue an eavesdropping investigation until they have identified the mules on which the coca-leaves were transported to a processing site somewhere in Colombia."

That some success had been achieved by less-intrusive methods, however, does not preclude the need for a wiretap. "[T]he government is not required to show that other investigatory methods have been completely unsuccessful." *Rivera–Rosario*, 300 F.3d at 19 (*citing United States v. Abou–Saada*, 785 F.2d 1, 11 (1st Cir. 1986)). "Rather, the district court must satisfy itself that the government has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence—to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable." *Abou–Saada*,

785 F.2d at 11. Furthermore, in their affidavits, the agents give specific reasons as to why they believed these methods were limited in the fruits they could bear. The statute only requires that the Government show that these methods "*reasonably* appear to be unlikely to succeed ..." 18 U.S.C. § 2518(1)(c)(emphasis added); *see also Abou–Saada*, 785 F.2d at 12 ("In our view, ... the affidavit was adequate. It indicates a 'reasonable likelihood' that efforts to use undercover agents would fail to find and to catch all the key conspirators.").

Therefore, the Court finds that the affidavit supporting the wiretap application complied with the necessity requirement and defendants' objections are without merit.

### 2. The 30–day Statutory Limit on Wiretaps

Section 2518(5) provides that

[n]o order entered under this section may authorize or approve the interception of any wire, oral, or electronic communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. Such thirty-day period begins on the earlier of the day on which the investigative or law enforcement officer first begins to conduct an interception under the order or ten days after the order is entered.

18 U.S.C. § 2518(5). Upon application by the Government, the order authorizing the interception may be extended for a similar period of thirty days. *Id.*

In their motions, defendants raised two challenges to the period of time the wiretaps were in place. First they argued that the Government should have terminated the interceptions upon achieving the objective of the interception and, thus, the Government should have discontinued the in-

terception before the thirty-day maximum. Furthermore, they argue that the interception of Target No. 2 exceeded the thirty-day maximum and the communications should be at least partially suppressed.

The Magistrate–Judge found, however, that the Government's reports show that, although some success had been achieved, the goals of the interception had not been completed before the thirty days expired. That the Government applied for and received an extension for the interception of Target No. 1 lends credence to this finding. Furthermore, the Magistrate–Judge found that the interception of Target No. 2 began on April 9, 2003 and not on April 3, 2003 as defendants argue. Therefore the interception of Target No. 2 did not exceed the statutory maximum.

■ In their objections, defendants have abandoned the argument that the Government had achieved its objectives before the thirty-day period and have concentrated their efforts on attacking the interception of Target No. 2. Mainly they attack the conclusion that the interception began on April 9, 2003.

The order authorizing the interception was issued on April 2, 2003. The Government argues that although they intended to begin the interception on April 3, 2003, technical difficulties with the provider did not allow its agents to begin recording conversations until April 9, 2003. On the other hand, defendants argue that because the wiretap was installed on April 3, 2003, and because Government records show that some calls made between April 3, 2003 and April 9, 2003 were identified, the order authorizing the interception expired on May 3, 2003 and any conversations recorded after that date must be suppressed.

The Court, however, must agree with the Magistrate–Judge's findings. Government records show that between April 3 and April 9 government agents conducted several technical tests (*See* Docket No. 162, Exh. 2). Furthermore, several phone calls made during that period were identified merely as to date and time the call was placed (*Id.*). The agents made no recordings or summaries as to the actual contents of those calls. The statutory definition of an interception requires the "acquisition of the contents any wire, electronic, or oral communication." 18 U.S.C. § 2510(4). The term "contents" of the communications is defined as "any information concerning the substance, purport, or meaning of th[e] communication." 18 U.S.C. § 2510(8). "The definition therefore includes anything relating to what was said or transmitted, but does not include 'transactional information'—information that only reveals that a communication occurred (and between or among whom), without revealing what was said or communicated." 1 Clifford S. Fishman & Anne T. McKenna, *Wiretapping and Eavesdropping*, § 2:9, pp. 15–16 (2nd Ed.1995 & Supp.2004). Thus, the data gathered during this period of time amounts to only transactional information and is no different from what other less intrusive methods, i.e. a pen register, would reveal. *Cf. United States v. New York Tel. Co.*, 434 U.S. 159, 167, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)("Pen registers do not 'intercept' because they do not acquire the 'contents' of communications, as that term is defined by 18 U.S.C. § 2510(8)"). Because the data gathered during this period does not include the actual contents of the communications, the Court must find that an "interception", as defined in the statute, did not begin until April 9, 2003 when the first recording was made.

3. *The Need for an Evidentiary Hearing*

■ On December 24, 2004, the Magistrate–Judge ordered the Government to

provide detailed information regarding the difficulties which delayed interception of Target No. 2 until April 9, 2003 (Crim. No. 03–249 Docket No. 180; Crim. No. 03–250 Docket No. 207; Crim. No. 03–251 Docket No. 307; Crim. No. 03–252 Docket No. 225). On December 23, 2004, the Government complied with the order, submitting the Assistant U.S. Attorney's representation of the answers given by the government agents to the questions posed by the Court (Crim. No. 03–249 Docket No. 181; Crim. No. 03–250 Docket No. 208; Crim. No. 03–251 Docket No. 309; Crim. No. 03–252 Docket No. 226). Several defendants objected to the Magistrate–Judge considering the hearsay statements contained within the Government's proffer and requested an evidentiary hearing (Crim. No. 03–249 Docket No. 182; Crim. No. 03–251 Docket No. 312). The Magistrate–Judge issued her Report and Recommendation without responding to this request. Defendants now raise objections to the Report and Recommendation because the Magistrate–Judge relied on the Government's statements without affording them with the opportunity to cross examine the agents at an evidentiary hearing.[6]

■ However, "[c]ourts are busy places. Not surprisingly, then, evidentiary hearings on motions are the exception, not the rule ... even in the criminal context, a defendant is not entitled as of right to an evidentiary hearing on a pretrial or post-trial motion" *United States v. McGill,* 11 F.3d 223, 225 (1st Cir.1993)(*citing United States v. Mala,* 7 F.3d 1058, 1062 (1st Cir.1993); *United States v. Tardiff,* 969 F.2d 1283, 1286 (1st Cir.1992); *United States v. DeCologero,* 821 F.2d 39, 44 (1st

Cir.1987)). "A hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." *United States v. Staula,* 80 F.3d 596, 603 (1st Cir.1996)(*citing United States v. Lilly,* 983 F.2d 300, 310–11 (1st Cir.1992); *United States v. Panitz,* 907 F.2d 1267, 1273 (1st Cir.1990)). "Most importantly, the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." *Id.*

Defendants in this case have failed to meet this burden. The main ground of their objection is the presumed right to cross-examine the agents. However, the request "must be supported by more than a mere desire to cross-examine." *See Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Defendants must direct the Court to specific factual disputes that would warrant the special treatment of an evidentiary hearing. They have not shown that such factual disputes exist on this record.

Furthermore, contrary to defendants' assertion, the Court cannot find that the Magistrate–Judge relied exclusively upon the Government's proffer when determining the date on which interception of Target No. 2 actually began. Even without these statements, the records of the investigation, which show that no recordings were made prior to April 9, 2003, provide sufficient support for that finding.

## CONCLUSION

For the aforementioned reasons, the Court **ADOPTS** the Report and Recom-

---

**6.** Defendant Valdes–Diaz raised an objection to the Magistrate–Judge's denial of an evidentiary hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The objection, however, merely consists of a general allegation that the *Franks* standard is inapplicable to this case without an attempt at developed argumentation. Accordingly, the objection is deemed waived. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990).

mendation in its entirety. Accordingly, the Court **DENIES** defendants' motions to suppress.

IT IS SO ORDERED.