**UNITED STATES of America,**
**Plaintiff,**

v.

**Elkin MELENDEZ–SANTIAGO**
**(2), Defendant.**

**Criminal No. 05–302(DRD).**

United States District Court,
D. Puerto Rico.

Aug. 18, 2006.

Ernesto G. Lopez–Soltero, United States Attorney's Office, San Juan, PR, for Plaintiff.

Jorge L. Armenteros–Chervoni, Luis R. Rivera–Rodriguez, Luis Rafael Rivera Law Office, San Juan, PR, for Defendant.

## OPINION AND ORDER

DANIEL R. DOMINGUEZ, District Judge.

The matters pending before the Court are a *Motion To Suppress Evidence Derived From Illegal Wiretaps And Electronic Intercepts; Request For Judicial Notice And For Franks Hearing Re: Necessity; And Memorandum Of Points And Authorities* (Docket No. 71); *Sealed Motion To Suppress Statements* (Docket No. 73); and, *Motion Submitting Exhibits For Motion To Suppress Illegal Wiretaps* (Docket No. 74), filed by co-defendant Elkin Meléndez–Santiago, and the motions to join the request to suppress evidence filed by co-defendants Tavarez and Tobal (Docket entries No. 101 and 137 respectively). For the reasons set forth below, all the requests to suppress evidence are **DENIED.**

### Factual and Procedural Background

#### A. Procedural Stage

On September 8, 2005, the Grand Jury returned an indictment against twelve co-defendants, being co-defendant Elkin Meléndez–Santiago ("Meléndez") among them. Co-defendant Meléndez is mentioned as defendant Number 2 and appears charged in Counts One, Four and Seven. Count One charges a violation to Title 21 U.S.C. §§ 952(a) and 963, conspiracy to import narcotics in excess of 5 kilograms or more of cocaine and in excess of 1 kilogram of heroin; Count Four charges the actual importation of narcotics a violation of 21 U.S.C. § 952; and Count Seven contains the narcotics related forfeiture allegations.

On January 11, 2006, co-defendant Meléndez filed a *Motion to Suppress Evidence Derived from Illegal Wiretaps and Electronic Intercepts; Request for Judicial Notice and for Franks[1] Hearing Re: Necessity; and Memorandum of Points and Authorities[2]* (Docket No. 71). On that same date, a *Sealed Motion to Suppress Statements* was filed by co-defendant Meléndez (Docket No. 73). On January 13, 2006, the Court denied co-defendant Meléndez' request to file statements under seal, as this motion does not constitute a sealed document, and ordered the unsealing of the motion. *See* Docket No. 75. The Court also requested a reply from the plaintiff, the United States of America (the "United States" or "government") by January 31, 2006 (Docket No. 75).

---

**1.** *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

**2.** On March 29 and July 14, 2006, co-defendants Anyiro Tavarez (# 7) and Aldo Mercedes Tobal (# 8) joined Meléndez motion. In doing so, no factual or legal arguments were submitted (Docket Nos. 101–and 137)

In compliance with this Court's Order, the United States timely replied to co-defendant Meléndez' motion on January 31, 2006. (Docket No. 82). Thereafter, additional evidence regarding the Title III application and progress report was made available for in-chamber inspection on March 8, 2006. (Docket No. 98).

## B. Defendant's Allegations

Co-defendant Meléndez moves for the suppression of all statements intercepted from wireless cellular telephone numbers (787) 306–0876, 306–3375 and 406–5587, hereinafter "the target phone facilities." Meléndez further requests a *Franks* hearing "on the showing of necessity, and the material omissions and misrepresentations in the affidavits of FBI Special Agent Julio Mena" (hereafter "S/A Mena"), dated November 23, 2004 and December 9, 2004.

Based on co-defendant Meléndez' motion, all three target phone facilities were primarily used and were subscribed to Luis Alfredo De la Rosa–Montero, a/k/a "El Compadre" (co-defendant No. 1.) Co-defendant Meléndez further asks the Court to take notice of several other documents, allegedly on record in Criminal Case No. 04–278(JAG)[3] and Misc. No. 04–308.[4]

In support of his request for a hearing, co-defendant Meléndez alludes to the two prong test set forth in *Franks*,[5] 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667, and proffers that S/A Mena recklessly omitted important information from the affidavit, and by doing so, erroneously induced the Court into determining that conventional investigative techniques had proven unsuccessful. Specifically, co-defendant Meléndez asserts that:

(a) S/A Mena failed to disclose to the Court the background and involvement of CS–2 (Roberto De los Santos), a Dominican national, highly trusted within the drug smuggling organization who was privy to information regarding drug suppliers, recruitment of boat captains, security of boats and stash houses, obtained distributors for the shipments and participated, internationally, in the transportation of drug proceeds;

(b) S/A Mena mislead the Court by not revealing that he is also of "Dominican heritage," but rather asserted in his affidavit that "the FBI has been unable to infiltrate this organization with an undercover agent" because "the subjects of this investigation are of Dominican heritage and due to the nature of the enterprise these subjects are engaged-in, they tend to distrust individuals of different backgrounds" (Docket No. 71 at 18).

In sum, co-defendant Meléndez contends that "the asserted inability of confidential informants and law enforcement officers to infiltrate the organization" constitutes a false statement; a statement recklessly made and thus, constituted the primary reason proffered to the Court while explaining why conventional investigative techniques were not successful in achieving

---

**3.** Co-defendant Meléndez requests that notice be taken of the U.S. Omnibus Response to Co-defendants' Motion to Continue Trial, in Criminal Case No. 04–278; Docket No. 2, and the Government's Stipulation of Facts as of Defendant Víctor Vega–Encarnación (defendant No. 3.)

**4.** Affidavit of S/A Mena, dated September 8, 2004 in support of Application for Search Warrant.

**5.** "[A] warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause." 438 U.S. at 165, 98 S.Ct. 2674.

the investigation's goals (Docket No. 71 at 19).

In asserting the insufficiency of the "necessity" requirement for validating a Title III request and Order, co-defendant Meléndez alludes to four basic arguments:

(1) S/A Mena's affidavit relies on boilerplate language that does not suffice Title III requirements;

(2) The government failed to demonstrate or distinguish how this drug conspiracy case differs from any other regular drug conspiracy investigation;

(3) S/A Mena's affidavit fails to show why conventional investigative techniques were insufficient to uncover the crime or its participants, as it fails to disclose the availability of a confidential source (–CS.2–), and how CS–2's cooperation evolved from September 23, 2004 thru December 9, 2004;

(4) Being there no legal basis for issuance of a Title III interception order, there was no basis for extending the initial Order of Interception, inasmuch as, the necessity requirement was not met on neither of S/A Mena's affidavits.

## C.  Government's Assertions

The government responded to co-defendant Meléndez' motion to suppress (Docket No. 82).  In its response, the government alleges that a *Franks* hearing is not warranted, inasmuch as, co-defendant Meléndez' challenges are based not on evidence but rather on conclusory allegations. The government considers that co-defendant Meléndez' questioning of why an undercover agent was unable to infiltrate the organization, and why the Court was never appraised of S/A Mena's nationality, are factors totally irrelevant and, thus, not worth discussing (Docket No. 82 at p. 3).

On March 6, 2006 the government was instructed to submit additional relevant information regarding applications for interception, affidavits in support and information on cooperating individual Roberto de Los Santos (Docket No. 91).

### *Legal Standard*

### A.  In General

### 1.  Title III Intercepts:

Chapter 119  of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, ("Title III"), governs the standards and procedures allowing for the interception of wiretaps and electronic communications, 18 U.S.C. §§ 2510–21. By placing statutory requirements on warrants authorizing wiretaps "extending beyond the constitutional minimum mandated for other search warrants" *(United States v. Nelson–Rodriguez,* 319 F.3d 12, 32 (1st Cir.2003)), Congress has "sought to protect the privacy of wire and oral communications while, at the same time, authorizing the use of electronic surveillance evidence obtained by law enforcement under specified conditions." *United States v. Lopez,* 300 F.3d 46, 51–52 (1st Cir.2002) (citing *Bartnicki v. Vopper,* 532 U.S. 514, 523, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001)).  As such, "the interception of electronic communications by law enforcement authorities is an extraordinary investigative technique whose use 'is to be distinctly the exception—not the rule.'" *United States v. Lopez,* 300 F.3d at 51 (citing *United States v. Hoffman,* 832 F.2d 1299, 1306 (1st Cir.1987)).  Given Congress' concern for preserving privacy under Title III, the government shall strictly adhere to statutory requirements, and among other things is required to:

i.  Seek approval from the U.S. Attorney General in order to apply to a federal judge for a wiretap order.

ii. If consent is obtained, the law enforcement officer must submit to the district Court a written application for a wiretap (18 U.S.C. § 2516(1)); and

iii. Before issuing the wiretap, the district judge must determine the existence of certain enumerated factors and requirements to be in a position to issue an ex-parte order authorizing the wiretap. 18 U.S.C. § 2518(1), (3), (4).

In order to ensure that the government performs a reasonable, good faith effort to use other viable normal investigative techniques before resorting to the wire interception and to assure that Title III procedures remain strictly the exception, law enforcement authorities seeking a wiretap warrant must submit a sworn affidavit, with a detailed proffer of:

a. The identity of the law enforcement officer making the application and the officer authorizing the application (18 U.S.C. § 2518(1)(a));

b. A full and complete statement of facts and circumstances warranting issuance of the wiretap[6] (18 U.S.C. § 2518(1)(b));

c. "A full and complete application statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." (18 U.S.C. § 2518(1)(c)). *See also United States v. Kahn*, 415 U.S. 143, 153, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); *United States v. Hoffman*, 832 F.2d at 1306.

d. A statement of the period of time for which the interception is required to be maintained (18 U.S.C. § 2518(1)(d));

e. A full and complete statement of the facts concerning all previous applications involving any of the same persons, facilities, or places specified in the application (18 U.S.C. § 2518(1)(e)); and

f. Where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results. 18 U.S.C. § 2518(1)(f).

In this context, it is a well settled principle that the judge's decision to grant a wiretap order is subject to review in two contexts. "First, the trial judge may consider a motion to suppress the evidence gathered by the wiretap that the issuing judge authorized; later, an appellate Court may review the trial judge's suppression ruling." *United States v. Nelson–Rodriguez*, 319 F.3d at 32 (citing *United States v. Ashley*, 876 F.2d 1069, 1074 (1st Cir. 1989)); *United States v. Villarman–Oviedo*, 325 F.3d 1, 9 (1st Cir.2003). In verifying, the Court will consider the contents of the affidavit and decide whether the "facts set forth in the application were minimally adequate to support" the decision of allowing for the electronic interception. *United States v. Nelson–Rodriguez*, 319 F.3d at 32; *United States v. Lopez*, 300 F.3d at 53 (citing *United States v. Ashley*, 876 F.2d at 1074); *United States v. Cole*, 807 F.2d 262, 268 (1st Cir.1986) (quoting *United States v. Bynum*, 763 F.2d 474, 476 (1st Cir.1985)); *United States v. Scibelli*, 549 F.2d 222, 226

**6.** Including details as to the particular offense, a description of the nature and facilities from which the communication is to be intercepted, type of communication to be intercepted and identity of the suspects or offenders. *United States v. Lopez*, 300 F.3d at 51–52, n. 1.

(1st Cir.1977). However, this standard does not impose upon the government an exhaustion requirement but rather requires the government to establish that it first made a "reasonable good faith effort" to utilize other available normal and less intrusive investigative techniques [7] before resorting to a wiretap. *United States v. Lopez,* 72 F.Supp.2d 5, 7 (D.P.R.1999) (D.J. Laffitte).

Law enforcement authorities will satisfy this requirement, if within the affidavit it is explained what investigative techniques have been utilized; which have proven successful and to what extent; which have proven or will result fruitless once attempted; and, whether the methods or techniques then or still in use, alone or combined with others not yet utilized, would likely fail to uncover the full extent of the conspiracy. *United States v. Kahn,* 415 U.S. 143, 153, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); *United States v. Rivera–Rosario,* 300 F.3d 1, 19 (1st Cir.2002); *United States v. Villarman–Oviedo,* 325 F.3d at 9; *United States v. Uribe,* 890 F.2d 554 (1989); *United States v. Hoffman,* 832 F.2d at 1306.

■ In determining whether investigative techniques other than wiretaps could be effectively used and, thus, whether to authorize a wiretap, the judicial officer is entitled to consider the nature of the offense charged and/or the underlying illegal conduct (*United States v. Velazquez–Feliciano,* 107 F.Supp.2d 134 (D.P.R.2000) (D.J. Laffitte)), while granting the government "latitude in choosing how best to continue the investigation." *United States v. David,* 940 F.2d 722, 728 (1st Cir.1991). While assessing whether the government has made adequate and reasonable use of other investigative procedures, the Court is not required to inquire nor is the government required to specifically indicate "the amount of time the investigators must try and fail, using other methods" before applying for a wiretap warrant or order. *United States v. Nelson–Rodriguez,* 319 F.3d at 33 (citing *United States v. David,* 940 F.2d at 729 (1st Cir.1991)). The court will also consider whether the government has diligently and in good faith deployed reasonable methods to uncover the identity of those engaged in criminal conduct, under the totality of circumstances and facts depicted. However, the evaluation on the sufficiency of the officer's affidavit in support of a Title III application should be made with practical "commonsense approach." *United States v. Lopez,* 72 F.Supp.2d at 7.

■ The Court must also consider and may also rely on the law enforcement agent's statements that are based upon his special training, knowledge and experience. *United States v. Ashley,* 876 F.2d at 1072; *United States v. Lopez,* 72 F.Supp.2d 5; *United States v. Montalvo,* 882 F.Supp. 230, 232 (D.P.R.1995) (D.J. Laffitte); *United States v. Rodriguez,* 606 F.Supp. 1363, 1368 (D.Mass.1985) (D.J. Caffrey).

## 2. Interception Period and Petitions for Extension

Title 18 U.S.C. § 2518(5), in its pertinent part, specifically provides that:

No order entered under this section may authorize or approve the interception of any wire, oral, or electronic communication for any period longer than is necessary to achieve the objective of the au-

---

7. Under 18 U.S.C. § 2518(1)(c) normal investigative procedures are considered to include: standard visual and aerial surveillance; interrogation of witnesses or participants (including the use of grand juries and the granting of immunity); search warrants, infiltration by undercover agents, use of pen registers and trap and trace devices.

thorization, nor in any event longer than thirty days. Such thirty-day period begins on the earlier of the day on which the investigative or law enforcement officer first begins to conduct an interception under the order or ten days after the order is entered.

In regards to petitions for extension on such original applications the statute also provides that:

Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the Court making the findings required by subsection (3) of this section. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days. Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days.

18 U.S.C. § 2518(5).

The enacted statute conveyed Congress' intent to have the length of wire interceptions determined in a case by case basis allowing for its termination, not necessarily on a predetermined calendar date, but when the objective of the authorization was achieved, and that each wiretap order issued would have a statutory life of thirty (30) days maximum, regardless of whether the objective of the authorization has been achieved. However, the statute allows and recognizes that each interception would have the very real potential of earlier extinction. 18 U.S.C. § 2518(4)(e), (5), (6). In *United States v. Cafero*, 473 F.2d 489,

496 (3rd Cir.1973), *cert. denied, Carero v. U.S.*, 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974), the Court held that 18 U.S.C. § 2518(5) provides for the "automatic termination [of the order] upon attainment of the objective of the authorization irrespective of whether a statement to this effect has been included by the authorizing judge." The Court also held that, "[w]e find nothing in this statutory schema to offend the standards previously expressed by the Supreme Court regarding the temporal aspects of the authorization." *Id.*

### B. Standing and Need for an Evidentiary Hearing

Co-defendant Meléndez asserts that the Title III orders were addressed to intercept all telephone communications originated from, or received at the target phone facilities which were primarily used by co-defendant Luis De La Rosa Montero (co-defendant Number 1). The government has not contested co-defendant Meléndez' standing to present such challenge, nor that of co-defendants Tavarez and Tobal who have joined the request for suppression. *See* Docket entries No. 101 for co-defendant Tavarez, and 137 for co-defendant Tobal. A review of the Indictment, specifically the description of co-defendants' roles as leaders, facilitator and loader, respectively; overt acts numbers 4, 10, 12 and 15, and S/A Mena's affidavits, dated November 23 and December 9, 2004, shows that co-defendants Meléndez, Tavarez and Tobal possess the standing to move to suppress the electronic interceptions and all derivative evidence. Thus, for purposes of this Opinion and Order it is considered that the defendants are "aggrieved parties" within the meaning of 18 U.S.C. § 2518(10)(a).

█ Having so determined, the court proceeds to address co-defendant Melén-

dez' requests for an evidentiary hearing on his motion to suppress electronic interceptions. The Supreme Court in *Franks,* concluded that defendants are entitled to an opportunity to challenge the truthfulness of the allegations within affidavits supporting search warrants, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667. However, the request "must be supported by more than a mere desire to cross-examine." *United States v. Lazu–Rivera,* 363 F.Supp.2d 30, 39 (D.P.R.2005) (D.J. García) (citing *Franks,* 438 U.S. at 171, 98 S.Ct. 2674). To be entitled to challenge the predicate of said warrants, co-defendants are required to make not a general but rather a "substantial preliminary showing" that: (1) a statement in the affidavit was knowingly and intentionally false, or made with reckless disregard for the truth and (2) the falsehood was necessary to the finding of probable cause. *United States v. Nelson–Rodriguez,* 319 F.3d at 34.

In the case at bar, co-defendant Meléndez has specifically alleged that the information within the affidavit submitted in support of a wire interception request is incomplete; that relevant information was omitted, and that some of S/A Mena's statements were made with reckless disregard for the truth. Meléndez also contends that the information submitted by the government, through the affidavit of S/A Julio Mena is vague, merely recites statutory language and did not support issuance of a wire interception order. Co-defendants Tavarez and Tobal have failed to submit any other factual or legal authorities. When considering co-defendant Meléndez' request for an evidentiary hearing, the undersigned remains mindful of the fact that the substantial showing that must be made by the co-defendants is not a mere formality but rather a burden that must be carried out because "evidentiary hearings on motions in criminal cases are the exception, not the rule." *United*

*States v. Alicea,* 205 F.3d 480, 487 (1st Cir.2000); *United States v. McGill,* 11 F.3d 223, 225 (1st Cir.1993) (citing *United States v. Mala,* 7 F.3d 1058, 1062 (1st Cir.1993)) (a hearing is required only if movant makes a sufficient threshold showing that material facts are in doubt or dispute).

█ Having examined the general allegations made by the co-defendants, and based on the evidence on record, the Court concludes that co-defendant Meléndez has not met the *Franks'* requirements that would have otherwise entitled him to a pretrial evidentiary hearing. The court explains.

### 1) Agent's Failure to Report his Nationality

Co-defendant Meléndez asserts that S/A Mena provided false or reckless statements in order to obtain issuance of the wire interception order. Co-defendant Meléndez specifically highlights the agent's averment that the drug organization could not be infiltrated by undercover agents given the fact that the drug dealers, being Dominican nationals, distrusted individuals from "different cultural backgrounds" (Docket No. 71 at 18). Meléndez further argues that S/A Mena's statement is plainly unreasonable or false, as S/A Mena failed to disclose his nationality (purportedly, S/A Mena is a Dominican national) (Docket No. 71 at 18).

We begin by noting that the phrase "different cultural backgrounds" may be construed to imply many other factors rather than "different nationality," which is the interpretation given to such phrase by co-defendant Meléndez. Even assuming, *arguendo,* that this proposition is genuine, co-defendant Meléndez fails to establish how, and why prior knowledge of S/A Mena's nationality would have warranted a

different Court ruling. The Court, based upon the factual grounds presented, found probable cause and determined that the wire interception was warranted.

Defense counsel appears to suggest that S/A Mena, being a Dominican national, could have acted as an undercover agent, and as such, obtain the necessary information and evidence, to make the wire interception unnecessary. This allegation is speculative and constitutes mere conjecture. Co-defendant Meléndez fails to submit any evidence reflecting whether S/A Mena was qualified by either training or experience to act as an undercover agent. S/A Mena affidavits, however, show that as of November 23, 2004, he had less than two years of experience with the Federal Bureau of Investigations. Moreover, after considering S/A Mena's prior participation in narcotics investigations (by debriefing witnesses, conducting surveillance, analyzing pen registers, data, toll records and trap and trace intercepts), there is no indication that S/A Mena ever received any training to act or has ever acted in an **undercover** capacity. The record fails to reveal that, being merely of a Dominican heritage provides him with the capacity to perform any **undercover** work to infiltrate the conspiracy.

Had S/A Mena disclosed his Dominican nationality, probably more weight could have been assigned to his statement assuring that members within the drug organization were not prong to trust others from "different cultural backgrounds." In sum, it is uncontested that co-defendant Meléndez has failed to establish that the Court would have declined issuance of the interception warrant, had the Court have prior knowledge of S/A Mena's nationality, just because "the suspects are of Dominican Heritage."

### 2) Availability of Confidential Sources

Co-defendant Meléndez asserts that S/A Mena concealed from the Court information regarding the existence and availability of a confidential source (Roberto De Los Santos), who was capable of providing information on the co-conspirators' identities or dealings. In support, co-defendant Meléndez moves the Court to review the record, specifically Docket No. 2 in Criminal Case No. 04–278 and Misc. Case No. 04–308(M), also at Docket No. 2. The latter is an affidavit submitted on September 10, 2004 by S/A Mena in support of a search warrant.

Upon reviewing the September 10, 2004 affidavit, it is noted that the information S/A Mena provided in regards to his professional background is similar and consistent with that proffered in the affidavits in support of the application for interception. The information therein provided by S/A Mena, reportedly, was obtained from fellow state and federal law enforcement agents, witnesses, other concerned parties and a reliable "confidential informant." Within the affidavit, information is provided, regarding the results of a surveillance conducted on September 3, 2004 on the main target's place of residence.

Although co-defendant Meléndez does not specifically alleges that there were other sources of information available, Meléndez suggests that as of September 3, 2004, law enforcement agents had available, as an investigative tool, the assistance of a confidential informant that was able to identify and lead the agents to the main target's residence. Because there was a confidential source available, co-defendant Meléndez suggest that there was no need to resort to intrusive means, such as, interception of oral communications.

Co-defendant Meléndez also requests the Court to review Docket No. 2 of Crimi-

nal Case No. 04–278, and specifically directs the Court's attention to an Omnibus Response filed by the government in support of a request for continuance of trial. A docket review of Criminal Case No. 04–278 shows that Docket No. 2 contains the Court minutes of the proceedings held on July 19, 2004[8]. The Court record shows that the responses filed by the government (one is an Omnibus Response) in Criminal Case No. 04–278, do relate, to some extent, to Roberto De Los Santos (CS–2). *See* Docket entries No. 69 and 142. On March 9, 2005, the government specifically objected to the disclosure of the identity of informants and sealed records within a different criminal case (Docket No. 69 of Criminal Case No. 04–278). On October 5, 2005, the government filed and Ominibus Response and certified having submitted for "in-chambers" examination the "toll records" from "MDC Guaynabo" from R. De Los Santos (Docket 142 of Criminal Case No. 04–278). Those "toll records" were submitted to the Court under seal, on September 15, 2005 (Docket No. 142 of Criminal Case No. 04–278).

Thus, it is clear that Roberto De Los Santos is a cooperating witness, and that this fact was known to all the associates within Criminal Cases No. 04–278 and 05–302. The fact that De Los Santos was detained at MDC–Guaynabo was also known, precluding the informant's prospective use by the government beyond the date in which the cooperating witness was detained. Thereafter, the government has relied on the historical information available to De Los Santos.

In the case at bar, the government proffers that the available confidential informant (CS–2: Roberto De Los Santos) had cooperated with the government in an unrelated case to the case at bar. The cooperation began approximately in July, 2004.

Thereafter, De Los Santos was taken into custody in September 3, 2004. At the time CS–2 (De Los Santos) was placed into custody, it was already known by drug dealers and associates, that he was assisting law enforcement agents. Moreover, at the time of his detention, CS–2 was under actual and real life threats, and his former place of residence had become known to the co-conspirators. Several hearings were held before former U.S. Magistrate–Judge Aida M. Delgado–Colón on this matter. During the hearings, the government proffered and it became apparent, that the information available to De Los Santos was related to the collection of drug proceeds rather than matters directly related to the drug distribution and sale of narcotics or the identities of those involved in the latter activities. (See Sealed Record 04–244(M)).

Co-defendant Meléndez appears to challenge the validity of S/A Mena affidavit suggesting that through a confidential informant, the government had the ability to infiltrate the drug organization. Co-defendant Meléndez' argument is, once again, unsupported and, thus, meritless. Even assuming, *arguendo*, that it was CS–2 who provided information, or the one who led the government agents to the premises to be searched in Misc. No. 04–308(M), the Court cannot find that, CS–2 could have infiltrated the organization; he was still considered a true associate of the organization; and, he would have been trusted to, and allowed to engage in further illegal activities in furtherance of the conspiracy. Moreover, the affidavit, submitted on September 10, 2004 alludes to the results of a surveillance conducted on September 3, 2004. The government has proffered, and the records reflect, that the confidential informant was taken into custody, on or

---

**8.** Minutes of Initial Appearance as to Daniel Soriano–Peralta and José Díaz–Sánchez.

about September 3, 2004. The government has also proffered, as supported by the records, the reasons why the confidential informant was taken into custody, that is, his cooperation with the government had become known, and his life was at great risk. It will be disingenuous to believe that under such scenario, the confidential informant could have assisted law enforcement agents beyond September, 2004.[9] The members of the drug organization would have been reluctant and distrustful of unknown individuals approaching them, particularly after they learned of De Los Santos' cooperation with the government. Even assuming, *arguendo*, that the government received valuable information from the confidential informant prior to September, 2004, it is not reasonable to conclude that some other confidential informant would have been able to infiltrate the organization.

Co-defendant Meléndez further asserts in his motion that "S/A Mena's lack of initiative to actively pursue traditional investigative avenues is seen in his dismissal of traditional investigative techniques, from September 23, 2004 to December 9, 2004, by the simple word processor techniques cutting and pasting without ever attempting such traditional techniques as introducing undercover officers as the investigation progressed and evolved"[10] (Docket No. 71 at 14). The Court finds that co-defendant Meléndez' allegations are conclusory in nature, and unsupported by any record evidence.

In the affidavit in support of the Application for Wire Interception, the government outlined in detail, all the investigative steps undertaken prior to submitting such a request. Even if at hindsight, one may identify an investigative technique not uti-lized or not fully implemented, such fact, *per se*, will not invalidate a wiretap order. See *United States v. Webster* 734 F.2d 1048, 1054 (5th Cir.1984) (citing *U.S. v. Hyde*, 574 F.2d 856, 869 (5th Cir.1978)).

### 3. Boilerplate Language: Necessity Requirement

Under this scenario, the court moves to consider the alternate issues raised by co-defendant Meléndez regarding the sufficiency of the affidavits; the necessity for electronic interception; whether the government complied with the minimization requirement, as well as other statutory requirements; and whether the government exceeded the statutory requirement of thirty (30) day maximum interception period. *See United States v. Lazu–Rivera*, 363 F.Supp.2d at 36. *See also United States v. Abou–Saada*, 785 F.2d 1 (1st Cir.1986); *United States v. Lopez*, 72 F.Supp.2d at 9. The court's review of the wiretap affidavit "is limited to the four corners of the affidavit." *United States v. Nelson–Rodriguez*, 319 F.3d at 33.

Under 18 U.S.C. § 2518(1)(c), each application for an order authorizing or approving the interception of a wire, oral, or electronic communication shall provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." This requisite has become known as the "necessity requirement" and "is designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Lopez*, 300 F.3d at 52 (citing *United States v. Kahn*, 415 U.S. 143, 153, n. 12, 94 S.Ct. 977, 39 L.Ed.2d

---

**9.** It must be noted that the Affidavits in Support of Application for Interception are dated November 23, 2004 and December 9, 2004.

**10.** Docket No. 71 at 14.

225 (1974)). However, 18 U.S.C. § 2518(1)(c) does not impose an exhaustion requirement upon the government.

In the case at bar, co-defendants have raised several theories as to why the government allegedly failed to make a complete and honest statement of facts. Having thoroughly examined each defendants' allegations and each of the two applications in support of Title III interception, the defendants' contentions are considered meritless.

The affidavits submitted in support of the Title III applications described at length how and to what extent the government had successfully resorted to confidential sources. On the Application for Wire Interception of November 23, 2004, and the affidavit submitted in support thereof, the government alludes to the information provided by three confidential sources (C–1, C–2 and C–3), and one confidential informant. At the inception, the government acknowledged that CS–1 and CS–3 had "been documented source of the FBI for four and five years" while CS–2 had provided cooperation for a period of "17 weeks." Information regarding the confidential sources' attempts to infiltrate the organization by offering their services in securing boats or small vessels for the drug smuggling venture, is also set forth in the affidavit (Docket No. 74 at pages 9–11). In the Application for Wire Interception, the government disclosed the results of pen registers, and trap and trace devises previously utilized. The government also proffered having used surveillance with limited success, inasmuch as, the areas under surveillance in the District of Puerto Rico or St. Thomas are such, that foreigners could be easily detected. Consensual recordings were generated with the assistance of some confidential sources. Historic information on the organization was also obtained through the assistance of some confidential sources. These investigative techniques, although successful, did not, by themselves or combined, enable the government to decipher the role of some suspects already identified by either their first name or nickname. The information available consisted mainly of evidence incriminating Félix Rafael Egipciaco–Figueroa, and had enabled the arrest of some others participating in separate and/or isolated drug deliveries or importations. However, the information gathered failed to disclose the identity of his narcotics' suppliers, his distributors, his contacts outside Puerto Rico, the stash houses nor the structure of the entire organization. Moreover, at the time the Title III applications were submitted, the government was still utilizing and intended to continue the use of pen registers, track and trace devices, confidential sources, investigation or examination of police reports and arrest records.

It is widely recognized that the purpose of these other investigative techniques requirements is not to eliminate the possibility of electronic surveillance until every other imaginable investigative method is used and has proven fruitless. *See United States v. Lopez,* 300 F.3d at 52; *United States v. Ashley,* 876 F.2d at 1074; *United States v. Lazu–Rivera,* 363 F.Supp.2d at 34–37 (fact that federal agents had achieved some degree of success in their investigation of suspected narcotics' trafficking and weapons' conspiracy via less-intrusive methods, such as, confidential informants, undercover agent, pen register, and records reviews, did not preclude finding of necessity for wiretap under federal wiretap statute).

But contrary to co-defendant Meléndez' assertion, the Court is only required to decide whether the facts set forth in the supporting affidavit (to the wire application) are "minimally adequate" to support

the determination of having issued the interception order. *United States v. Villarman–Oviedo,* 325 F.3d at 9. Having examined and having conducted a "common sense and practical" review of the two affidavits submitted in support of the wire applications and the applications per se, the question of whether there existed probable cause for issuance of a wiretap order must be answered in the affirmative. In the present case, the government's affidavits readily meet the standard set in 18 U.S.C. § 2518(1)(c).

Accordingly, the requests made by co-defendant Meléndez, joined by co-defendants Tavarez and Tobal, for suppression of Title III evidence on the basis that the government failed to satisfy the 18 U.S.C. § 2518(1)(c) necessity requirements, are **DENIED.**

**IT IS SO ORDERED.**